Timothy **PRINDABLE**,
et. al., Plaintiffs,

v.

**ASSOCIATION OF APARTMENT OWNERS OF 2987 KALAKAUA**,
et. al., Defendants.

No. CIV. 02–00504 ACK/LE.

United States District Court,
D. Hawaiʻi.

July 11, 2003.

Brian G. Shaughnessy, Honolulu, HI, for Timothy Prindable, John Dubois, plaintiffs.

Lissa H. Andrews, Andrews & Yamamoto, Honolulu, HI, for Association of Apartment Owners of 2987 Kalakaua, a domestic nonprofit corporation, Certified Management, Inc., a domestic corporation, Lois Cain, Stacy Tokairin, Suzanne Macgill, John Does 1–10, Doe Partnership, Doe Corporations, or Other Entities 1–10, defendants.

### *ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER*

KAY, District Judge.

### *BACKGROUND*

This matter comes before the Court on Defendants Association of Apartment Owners of 2987 Kalakaua, Certified Management, Inc., Lois Cain, Suzanne MacGill and Stacy Tokairin's (collectively "Defendants") Motion for Summary Judgment, filed May 8, 2003 ("MSJ"). Plaintiffs Timothy Prindable and John Dubois (collectively "Plaintiffs") filed a Memorandum in Opposition to Defendants' Motion for Summary Judgment on May 29, 2003 ("Memo in Opp.").[1] Plaintiffs filed a Motion for Temporary Restraining Order on June 3,

---

1. Plaintiffs styled their pleading as a "Memorandum in Opposition to Defendant[s'] Motion for Summary Judgment and in Support of Plaintiffs['] Cross Motion for Summary Judgment." Plaintiffs did not, however, file a cross-motion for summary judgment in accordance with Local Rule ("L.R.") 7.9. The Court's clerk notified Plaintiffs' counsel of the missing motion, but the defect was not cured in the manner suggested. The Court recognizes its authority to enter judgment in favor of the nonmoving party, even in the absence of a cross-motion, *see* Wright, Miller & Kane, *Federal Practice & Procedure:* Civil 3d § 2720 (1998), but concludes that its discretion is best exercised by limiting review to those issues properly presented. Accordingly, the Court will treat Plaintiffs' pleading as a memorandum in opposition and will not consider whether Plaintiffs are entitled to judgment in their favor. *Cf. Aqautherm Indus., Inc. v. Florida Power & Light Co.,* NO. 92–1047–CIV–ORL–22, 99 U.S. Dist. Lexis 21634, at *1 (D.Fla. Dec.16, 1996); *In re Ryan,* NO. 93–17922–CJK, 1996 WL 442737, **4–5, 1996 Bankr.Lexis 312, at *12–13 (Bankr.D.Mass. Feb.22, 1996). In any event, this issue is mooted by the Court's conclusion that Defendants are entitled to summary judgement on the relevant claims. Plaintiffs' Memo. in Opp. did not comply with L.R. 7.5(a) as filed. The Court's clerk requested that Plaintiffs conform to the rules but no action was taken.

2003 ("Motion for TRO").[2] The Court heard both motions on June 16, 2003. For the following reasons, the Court GRANTS in part and DENIES in part summary judgment in favor of Defendants and DENIES Plaintiffs' Motion for TRO.

## I. *Factual History*

### A. *Ownership Dispute*

Plaintiff John Dubois asserts an ownership interest in unit 102 of the condominium project known as the "2987 Kalakaua," (Declaration of John Dubois "Dubois Decl." ¶ 4),[3] a residential apartment complex located at 2987 Kalakaua Avenue.[4] Defendants offer evidence showing that the AOAO foreclosed on a statutorily-created lien held against unit 102.[5] (Defendants' Ex. 2). According to a quitclaim deed executed on July 16, 2001, the AOAO purchased unit 102 for the sum of one dollar at public auction conducted on July 13, 2001. *Id.* The deed is recorded with the bureau of conveyances. *Id.*

Following the sale, Dubois refused to vacate and filed a state court action on August 14, 2001, to contest the validity of the non-judicial foreclosure. (Dubois Decl. ¶ 18). For its part, the AOAO brought a Complaint for Ejectment against Dubois on September 7, 2002. The actions were consolidated with two additional matters[6] and set for trial on September 1, 2003, before the Honorable Gary W.B. Chang.

### B. *Application of the 2987 Kalakaua Bylaws*

Interesting as the foregoing issues may be, the instant case does not directly concern whether the AOAO or Dubois holds

---

**2.** Plaintiffs' original filing included a "Cross Motion for Temporary Restraining Order and Preliminary Injunction" and a memorandum in support of the same. Because this "cross-motion" did not comply with the Local Rules, the Court's clerk instructed Plaintiffs' counsel to withdraw and refile the motion and memorandum. Plaintiffs did not withdraw the motion and, indeed, filed a similar motion and memorandum that did not comply with L.R. 7.2, 7.5(a) and 7.5(f). The Court's clerk again informed Plaintiffs' counsel that the motion was not properly brought or supported. Plaintiffs were directed to withdraw the pleading, refile the Motion for TRO to be heard on June 16, 2003, and refile the Motion for Preliminary Injunction in a manner consistent with the Rules. The direction was not followed, although Plaintiffs' counsel did submit a defective L.R. 7.5(b) certification for the memorandum and, eventually, noticed the Motion for Preliminary Injunction for a later date. Nevertheless, the Court will treat Plaintiffs' Motion for TRO as properly brought and the memorandum in support as compliant.

**3.** Defendants raise several evidentiary objections to portions of the Dubois Decl. (Defendants' Reply Memorandum in Support of Defendants' Motion for Summary Judgment, filed June 5, 2003 ("Defendants' Reply") at 1–2). The challenged paragraphs are not relevant to the disposition of the present matter and, therefore, the Court does not consider these objections.

**4.** As filed, Plaintiffs' Concise Statement of Material Facts did not comply with Local Rule 56.1(d). This problem was eventually corrected. Although Plaintiffs' Concise Statement challenges many of the facts listed in Defendants' Concise Statement of Material Facts, the Court has carefully reviewed the affidavits, declarations and exhibits submitted in favor of and in opposition to summary judgment and finds that few of the relevant facts are actually in dispute. Indeed, many of the exhibits purportedly contested are attached to Plaintiffs' Memo. in Opp. as supporting documents. Accordingly, the facts recounted herein are uncontroverted unless otherwise noted.

**5.** The lien—stated to be $19,776.09 on January 9, 2001—apparently arose because Dubois failed to pay his maintenance fees and the subsequently assessed late fees and legal fees. (Plaintiffs' Ex. 31). The original auction date was set for March 16, 2001. *Id.;* (Plaintiffs' Ex. 30). It is not clear from the evidence why the public sale was delayed until July.

**6.** Dubois filed unrelated claims against the AOAO on April 19, 2000, and March 6, 2001.

title to unit 102. This action instead arises from a lengthy dispute over the application of article VI, § 11 of the bylaws for the 2987 Kalakaua. That provision provides:

> No animals, noisy birds, or reptiles shall be permitted on the premises, except that qualified individuals with disabilities may have assistance animals. Such animals shall be required to conform to appropriate behavior standards established by the board and shall be removed if they disturb the quite enjoyment of other residents. A disabled resident must provide appropriate medical documentation justifying the need for the assistance animal before bringing it onto the project.[7]

(Defendants' Ex. 1).

### 1. Dubois' Exemption Request

On January 12, 2000, Dubois—then the undisputed owner of unit 102—presented the AOAO with an open letter from Brian O'Connor, M.D. (Affidavit of Lois Cain "Cain Aff." ¶ 5). The letter was dated May 22, 1999, and stated that Dr. O'Connor saw Dubois as a patient on May 21, 1999, at which time Dubois described "a situation in his apartment building that causes him to reasonably be concerned about his personal safety. He believes that his personal safety will be improved if he were to have a dog.... Please allow him to have a dog for his personal safety." (Defendants' Ex. 3).

Concurrent with his submission of Dr. O'Connor's letter, Dubois brought an English Bulldog named "Einstein" into unit 102. (Cain Aff. ¶ 6). The AOAO reviewed Dubois' request and through its agent, Defendant Certified Management, Inc. ("CMI"), notified Dubois that " 'personal safety' is not a valid justification for ap-

proval." (Plaintiffs' Ex. 68); (Defendants' Ex. 4). The AOAO subsequently informed Dubois that Einstein must be removed unless Dubois properly documented his medical condition and requested a reasonable accommodation. (Plaintiffs' Ex. 40). Dubois did not accede.

On June 3, 2000, Dubois asked to have his request for an exemption reexamined based solely on the May 22, 1999 letter from Dr. O'Connor. Dubois suggested that the board misinterpreted Dr. O'Connor's diagnosis. According to Dubois, Dr. O'Connor recommended that Dubois be allowed to keep a dog to "cope with the stress, poor sleep patterns[ and] problematic aliments" resulting from trauma from an earlier assault. (Defendants' Ex. 9).

An attorney for the AOAO, John Morris, Esq., wrote to Dr. O'Connor for additional information regarding Dubois medical condition. Dr. O'Connor was asked to provide an explanation (1) of the nature of Dubois disability and "why that disability requires him to have a pet"; and (2) as to why allowing Dubois to have a pet is "a reasonable accommodation for his disability." (Defendant's Ex. 10). Mr. Morris stated that the information received would be confidential and "reviewed only by the board and manager and not distributed to the other residents of the project or anyone else, unless required by law." *Id.* Dr. O'Connor did not reply and no further action was taken on Dubois' request.

### 2. Prindable's Exemption Request

On May 17, 2000, Plaintiff Timothy Prindable, Dubois roommate and partner, submitted a note handwritten on a prescription pad from the Waikiki Health Center.[8] The note read, "Prindable has a

---

7. The "no pets" policy in effect until June 2000 did not include an exception for assistance animals. (Defendants' Ex. 1). Article VI, § 11 was changed to its present form to reflect federal law.

8. The signature on the note is not clear, but

medical illness for which a dog is necessary for his improvement." (Cain Aff. ¶ 8); (Defendants' Ex. 5); (Plaintiffs' Exs. 1, 3). By letter dated May 18, 2000, CMI informed Dubois that the foregoing note was "not an acceptable certification for approval to possess a pet," and that Dubois should "submit an original letter from [his] physician," which "states the nature of the 'medical illness' or disability[ ] and how a pet would alleviate the effects of this handicap." (Defendants' Ex. 6).

In response, Dubois submitted two documents: the first—a letter directed to the AOAO Board of Directors and signed by Dubois and Prindable—notified the board that Dubois had spoken with the Hawaii Civil Rights Commission ("HCRC") and believed he was "not obligated . . . to disclose the nature of [his] illness to a condominium association." (Defendants' Ex. 7). The second document was a letter to CMI and its president, Defendant Lois Cain, from Dr. Kalauawa. The letter from Dr. Kalauawa, dated May 31, 2000, repeated that Prindable "has a medical illness for which a dog is necessary for his improvement" but contained no further details. *Id.*

Mr. Morris wrote to Dr. Kalauawa on June 2, 2000, for more information concerning Prindable's request for a pet exemption. Specifically, Mr. Morris requested (1) confirmation that Prindable is a patient of Dr. Kalauawa; (2) information regarding Dr. Kalauawa's practice and medical licensing; (3) an explanation of the nature of Prindable's disability and "why that disability requires [Prindable] to have a pet"; and (4) a statement that allowing Prindable to have a pet is a reasonable accommodation for his disability." (Defendants' Ex. 8). Mr. Morris assured Dr. Kalauawa that the information provided would be kept confidential. *Id.* Mr. Morris repeated his request to Dr. Kalauawa by letter dated June 20, 2000. (Defendant's Ex. 11). Dr. Kalauawa did not reply.

On June 21, 2000, Geraldine Boyd, a behaviorist with the Kaiser Honolulu Medical Clinic ("Kaiser"), notified CMI by letter that Prindable had been under her care since May 25, 2000. (Plaintiffs' Ex. 4); (Defendants' Ex. 12). Based on an admittedly brief assessment, Ms. Boyd's clinical impression was that Prindable described symptoms of depression, and that a pet would "have a positive impact on [Prindable's] condition and a separation from his pet would exacerbate his condition. Continued medical, diagnostic, and behavioral health treatment, along with animal assisted therapy[,] are recommended for his improvement." *Id.* Ms. Boyd's diagnosis and recommendation were subsequently supported by Mark Lum, M.D., of Kaiser.[9] (Plaintiffs' Exs. 7,8); (Defendants' Exs. 13, 15).

the author was later revealed to be Elliot J. Kalauawa, M.D., of the Waikiki Health Center. Defendants challenge the admissibility of Dr. Kalauawa's note and several other documents submitted in opposition to summary judgment. Prindable is competent to aver that Dr. Kalauawa's note, as well as the letters from other doctors or health care professionals, are true and accurate copies of documents he received. So, too, that he produced these documents to the AOAO in support of his accommodation request. The Court agrees with Defendants, however, that the information stated in the letters is hearsay and not admissible for the truth of the matter asserted. Nevertheless, the Court will assume for purposes of this Order that the letters are what they purport to be and that the authors would aver to the matters stated therein if given the opportunity.

9. By letter of June 29, 2000, Dr. Lum notified the AOAO Board of Directors that Prindable was under his care, and that Dr. Lum agreed with the substance of Ms. Boyd's letter of June 21, 2000. (Plaintiffs' Ex. 7); (Defendants' Ex. 13). Dr. Lum repeated his diagnosis in an open letter dated August 5, 2000. (Plaintiffs' Ex. 8); (Defendants' Ex. 15).

Mr. Morris notified Prindable on July 18, 2000, that the AOAO Board of Directors would review Prindable's request for a reasonable accommodation at its regularly scheduled meeting in early August. (Plaintiffs' Ex. 18); (Defendants' Ex. 14). Pursuant to the terms of the letter, Prindable was granted permission to house Einstein in unit 102 until the board formally considered the matter, provided that Prindable agreed (1) to take full responsibility for Einstein; (2) not to permit Einstein to defecate or urinate at the complex; (3) not to permit Einstein to disrupt the quiet enjoyment of other tenants; (4) not to wash Einstein in the shower provided for residents; (5) not to permit Einstein to go into the laundry room or to stand on the common area furniture; (6) to keep Einstein within unit 102 or within the limited common yard area of the unit at all times; (7) to use the shortest possible route when taking Einstein to and from the unit, that is, through the pedestrian entrance and exit of the garage; and (8) not to walk Einstein on the project grounds or common areas, except when taking him to and from the unit. *Id.* Prindable agreed to these conditions.

Shortly thereafter, Prindable filed an HCRC housing discrimination complaint against the AOAO, Defendant Stacey Tokairin, community association manager for CMI, and the president of the AOAO. (Plaintiffs' Ex. 56); (Defendants' Ex. 16). The Complaint alleged that respondents had failed to make a reasonable accommodation for Prindable in light of his handicap. *Id.; see also* Declaration of Timothy Prindable ("Prindable Decl.") ¶ 21.[10]

On August 10, 2000, CMI informed Dubois and Prindable that the AOAO Board of Directors had reviewed Prindable's reasonable accommodation request and granted a temporary exemption from article VI, § 11, with final approval contingent on the outcome of the above-mentioned HCRC investigation. (Plaintiffs' Ex. 19); (Defendant's Ex. 17). Dubois and Prindable were reminded that the accommodation was subject to the rules stated in Mr. Morris' July 18, 2000 letter. *Id.*

## C. HCRC Investigation

As part of the HCRC review process, investigator Stephen K.L. Chang requested an interview with Dr. Lum "concerning [Prindable's] medical condition in general and in particular concerning the 'reasonable accommodation' letters he provided for you on June 29, 2000 and August 5, 2000." (Plaintiff's Ex. 14). Dr. Lum was interviewed on September 20, 2000.[11] (Plaintiffs' Ex. 15).

William P. Sheehan, M.D., a doctor with Kaiser, contacted Mr. Chang by letter dated September 28, 2000. The letter stated that Prindable "has been diagnosed with major depression, recurrent type, and anxiety. These conditions have been disabling to him, he has been unable to work, and he has severe symptoms as a result of this disability." (Plaintiffs' Ex. 9); (Defendants' Ex. 18). The letter also disclosed that Prindable had been in treatment at Kaiser since 1997, and that Dr. Sheehan expected the treatment to continue indefinitely. *Id.* Dr. Sheehan did not discuss animal-assisted therapy.

In early 2001, Dr. Sheehan wrote a similar letter to Judith Taylor, an advocate with the Hawaii Disability Rights Center. Unlike his earlier letter to Mr. Chang, Dr. Sheehan was quite clear about the benefits

---

10. Defendants object to portions of the Prindable Decl. (Defendants' Reply, at 1–6). The Court does not address these arguments because the challenged paragraphs are not relevant to the disposition of the present matter.

11. Defendants argue that Prindable cannot authenticate Mr. Chang's interview notes. (Defendants' Reply, at 2). The Court agrees and cites Plaintiffs' Exs. 15, 17 and 70 only as evidence that the interviews occurred.

of animal companionship. Specifically, Dr. Sheehan stated, "Mr. Prindable is at risk of deteriorating social function. Animal-assisted therapy, animal-assisted activities, and human-animal interaction reduce the risk of deteriorating social function, and reduce the risk of social withdrawal and isolation. With the assistance of a companion animal, [Prindable] will be able to function and manage the symptoms of his disability and functional impairment." (Plaintiffs' Ex. 10); (Defendants' Ex. 19). Dr. Sheehan did not, however, identify Einstein as individually trained to provide such benefits. *See id.*

The record contains little additional evidence concerning the HCRC investigation.[12] On May 13, 2002, the HCRC advised Prindable that Mr. Chang recommended closure of the action—effective the date of the notice—because Prindable had voluntarily withdrawn his complaint and elected court action. (Defendants' Ex. 20). The notice further informed Prindable that he had ninety days to file a private lawsuit against respondents in Hawaii State Circuit Court. *Id.*

### D. Other Factual Developments

Prindable, Dubois and Einstein continue to reside in unit 102. Presumably, they do so in accordance with the rules listed in the letters of July 18, 2000, and August 10, 2000, including the direction that Dubois and Prindable use "the shortest possible route" when taking Einstein to and from the unit. (Prindable Decl. ¶ 21). Prindable claims to have fallen while taking this route on January 29, 2002, and again on January 3, 2003. (Prindable Decl. ¶ 23); (Plaintiffs' Ex. 23). Timothy Broker, M.D., of the Lokahi Counseling Center, drafted an open letter to this effect on October 29, 2002.[13]

Mr. Morris contacted Dr. Broker by letter dated January 29, 2003. (Plaintiffs' Ex. 73). Mr. Morris acknowledged Dr. Broker's October correspondence and reiterated that Prindable continued to enjoy an exemption from article VI, § 11, pending confirmation of his disability. *Id.* As to Dr. Broker's request, Mr. Morris suggested that when Prindable feels dizzy, Dubois take Einstein using the "shortest possible route," while Prindable uses the "easiest exit" and meets the pair in front. *Id.* Dr. Broker did not reply.

### II. *Procedural History*

Plaintiffs filed the present action on August 9, 2002. The Complaint presented a litany of claims, and Plaintiffs prayed for compensatory and punitive damages, as well as declaratory and injunctive relief.[14] On May 8, 2003, Defendants moved for summary judgment as to all causes of action alleged in the Complaint.[15] Plaintiffs

---

12. Mr. Chang interviewed Cain on February 12, 2001, (Plaintiffs' Ex. 70), and Dr. Sheehan on July 5, 2001. (Plaintiffs' Ex. 17).

13. The letter stated, "[Prindable] has a condition that can cause him to become dizzy and this puts him in danger of falling. I am asking you to accommodate [Prindable] by allowing him to use the easiest exit from the property when he is without a companion and feeling this dizziness." (Plaintiffs' Ex. 12, 13). Defendants represent that the pedestrian exit through the garage is the easiest route.

14. The AOAO, CMI and Tokairin filed an Answer on December 5, 2002. Cain and Defen-

dant Suzanne MacGill answered on May 14, 2003.

15. The Complaint alleges causes of action for various violations of the Fair Housing Act of ("FHA"), violations of Hawaii Revised Statutes chapters 368 and 515, intentional infliction of emotional distress, negligent infliction of emotional distress, defamation, invasion of privacy, breach of fiduciary duty and abuse of process. Defendants' MSJ requests summary judgment "as to all causes of action alleged in the Complaint on the grounds that there are no material issues of disputed fact and Defendants are entitled to judgment as a matter of

filed their opposition on May 29, 2003, and a Motion for TRO on June 3, 2003. The Court heard both motions on June 16, 2003.

## STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [16] Fed. R.Civ.P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" [17] *Thrifty Oil Co. v. Bank of America Nat'l Trust & Sav. Ass'n*, 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by " 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987). So, too, the Court's role is not to make credibility assessments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51, 106 S.Ct. 2505.

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex*, 477 U.S.

law because Plaintiffs are unable or unwilling to establish that the accommodations they seek are reasonable and necessary." *Id.* The second portion of the quoted language is relevant only to Plaintiffs' claims for failure to make a reasonable accommodation (count I). The parties likewise limit the bulk of their arguments to this issue. Because the remaining FHA causes of action and counts II through IX have not been fully briefed (indeed, no Hawaii state law was cited), the Court will limit consideration to Plaintiffs' FHA claim for failure to make a reasonable accommodation. The remaining causes of action are not addressed herein and, if appropriate, Defendants may file a subsequent dispositive motion.

**16.** Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978).

**17.** Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers' Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir.1986).

at 322–23, 106 S.Ct. 2548; *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348; *California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.2002); *see also T.W. Elec. Serv.*, 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence tending to support the complaint." *T.W. Elec. Serv.*, 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## DISCUSSION

### I. The Fair Housing Act

The 1988 amendments to the Fair Housing Act ("FHA"), codified at 42 U.S.C. §§ 3601 to 3631, make it unlawful to "discriminate against any person ... in the provision of services or facilities in connection with [his] dwelling, because of a handicap" of that person or any person associated with that person. *See* 42 U.S.C. §§ 3604(f)(2), 3604(f)(2)(A), 3604(f)(2)(C) (1994). "Discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodation may be necessary to afford [a handicapped] person equal opportunity to use and enjoy the dwelling." 42 U.S.C. § 3604(f)(3)(B) (1994). The FHA does not, however, "extend a preference to handicapped residents," *United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994), and, therefore, "accommodations

that go beyond affording a handicapped [person] 'an equal opportunity to use and enjoy a dwelling' are not required by the Act." *Hubbard v. Samson Management Corp.*, 994 F.Supp. 187, 191 (S.D.N.Y.1998) (quoting *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 605 (4th Cir. 1997)).

■ Persons wrongfully denied a reasonable accommodation have recourse in state or federal court. 42 U.S.C. § 3613(a)(1)(A) (1994). To prevail on a claim for failure to make a reasonable accommodation, the plaintiff must establish (1) that he or an associate of his is handicapped within the meaning of § 3602(h) and, that the defendant knew or should have known of this fact; (2) that an accommodation may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (3) that such accommodation is reasonable; and (4) that the defendant refused to make the requested accommodation.[18] *See* 42 U.S.C. 3604(f)(3)(B); *California Mobile Home II*, 107 F.3d, at 1380; *Janush v. Charities Housing Dev. Corp.*, 169 F.Supp.2d 1133, 1135 (N.D.Ca.2000); *In re Kenna Homes Coop. Corp.*, 210 W.Va. 380, 557 S.E.2d 787, 794 (2001); *Bryant Woods Inn*, 124 F.3d at 603. This "inquiry is highly fact-specific, requiring case-by-case determination." *California Mobile Home*, 29 F.3d at 1418.

### A. Evidence of Handicap

Plaintiffs must first show that either Dubois or Prindable is "handicapped," and that Defendants knew or reasonably should have known of this fact. *See* 42 U.S.C. § 3604(f)(3)(B); *California Mobile Home II*, 107 F.3d at 1380; *In re Kenna Homes*, 557 S.E.2d at 794. The term "handicap" is defined by statute as "(1) a

18. The plaintiff has the burden of proof. *See United States v. California Mobile Home Park Management Co. [California Mobile Home II]*,

107 F.3d 1374, 1381 (9th Cir.1997); *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044–45 (6th Cir.2001) (citing cases).

physical or mental impairment which substantially limits one or more of such person's major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h) (1994). Accompanying regulations interpret "physical or mental impairment" to include "Human Immunodeficiency Virus infection" ("HIV") and any "mental or psychological disorder," such as "emotional illness." 24 C.F.R. § 100.201 (2002). Finally, "major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Hall v. Meadowood Limited P'ship*, No. 99–17122, 7 Fed.Appx. 687, 689, 2001 U.S.App. Lexis 5718, at *2 (9th Cir. March 28, 2001) (citing 24 C.F.R. § 100.201(b)) (pursuant to Rule 36–3(a) of the Ninth Circuit Rules, the Court is not relying on this unpublished opinion for authority).

There is no evidence that would lead a reasonable jury to conclude that Dubois is handicapped within the meaning of § 3602(h) or, assuming Dubois is handicapped, that Defendants knew of this fact. *See Hall*, 7 Fed.Appx. 687, 690, 2001 U.S.App. Lexis 5718, at 3; *Hughes v. Housing Management Serv.*, No. 99–3503, 2000 WL 518103, **1–2, 2000 U.S.App.

Lexis 8499, at *4–5 (7th Cir. April 14, 2000). Without such evidence, Dubois is not entitled to a reasonable accommodation under § 3604(f)(3)(B) and the inquiry need go no further. *See* 42 U.S.C. § 3604(f)(2).

■ There is evidence, however, that would enable a reasonable jury to conclude Prindable is handicapped within the meaning of § 3602 and that Defendants knew of his handicap. Specifically, Ms. Boyd's letter of June 21, 2000, opines that Prindable described symptoms of depression, (Defendants' Ex. 12), and Dr. Lum concurred with Ms. Boyd's evaluation in letters dated June 29, 2000, (Defendants' Ex. 13), and August 5, 2000. (Defendants' Ex. 15). In addition, Dr. Sheehan's letters of September 28, 2000, and February 13, 2001, identify Prindable as suffering from a mental dysfunction that impairs his ability to work.[19] (Defendants' Exs. 18, 19). These letters were submitted to the AOAO. Finally, Prindable avers that he has HIV,[20] depression and anxiety, and that he has been unable to work.[21] (Prindable Decl. ¶¶ 1, 2). Although insufficient to establish that Prindable is handicapped within the meaning of § 3602(h), the evidence, taken together, creates a genuine issue of material fact as to Prindable's condition and the AOAO's knowledge of the same.[22]

19. Dr. Kalauawa's prescription pad note and subsequent letter to CMI are too brief and conclusory to be of any value in determining whether Prindable is handicapped for purposes of the FHA.

20. Contrary to the allegations presented in the Complaint and Plaintiffs' argument at the June 16, 2003 hearing, there is no evidence that Defendants knew Prindable is HIV positive.

21. Defendants raise sound challenges to the weight of the foregoing evidence. (Defendants Memorandum in Support of Motion for Summary Judgment, filed May 8, 2003 ("Memo. in Supp."), at 14–16); (Defendants' Reply, at 2). But that is an issue best left to

the jury. *Cf. Anast v. Commonwealth Apartments*, 956 F.Supp. 792, 801 (N.D.Ill.1997); *Valenti v. Salz*, No. 94 C 7053, 1995 WL 417547, *3, 1995 U.S. Dist. Lexis 9920, at *8 (N.D.Ill. July 13, 1995).

22. This is not to say that Defendants are precluded from further inquiry into the nature of Prindable's disability. "[W]here a tenant suffers from a disability which is not apparent to a person untrained in medical matters, it is reasonable for a landlord or person similarly situated to require a second concurring opinion from a qualified physician selected by the landlord or person similarly situated to substantiate the tenant's need for a service animal." *In re Kenna Homes*, 557 S.E.2d at 799.

## B. Necessity of the Accommodation

The second element of an FHA claim directs Plaintiffs to show that the requested accommodation is necessary to afford Prindable an equal opportunity to use and enjoy unit 102 of the 2987 Kalakaua. *See* 42 U.S.C. § 3604(f)(3)(B); *see also Hubbard,* 994 F.Supp. at 190; *Trovato v. City of Manchester,* 992 F.Supp. 493, 497 (D.N.H.1997); *Anast,* 956 F.Supp. at 801. In other words, Plaintiffs must demonstrate that preventing Prindable from housing Einstein in unit 102 "causes the denial" of Prindable's right to equal "use and enjoyment" of unit 102. *See Bryant Woods Inn,* 124 F.3d at 604; *California Mobile Home II,* 107 F.3d at 1380; *In re Kenna Homes,* 557 S.E.2d at 794.

■ In certain circumstances, service animals may be necessary accommodations. *See Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995); *California Mobile Home,* 29 F.3d at 1417; *Fulciniti v. Village of Shadyside Condo. Ass'n,* Civ. No. 9601825, 1998 U.S. Dist. Lexis 23450, at *14 (W.D.Pa.1998 Nov. 20, 1998). The term "service animal" is not defined by the FHA or the accompanying regulations, but it is understood for purposes of the Americans with Disabilities Act of 1990 ("ADA") to include "any guide dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability . . . ."[23] 28 C.F.R. § 36.104 (2002). This description comports with the example of a reasonable accommodation for a blind rental applicant provided by the agency regulations to the FHA, *see* 24 C.F.R. § 100.204(b) (2002), and with case law. *See Bronk,* 54 F.3d at 429; *Green v. Housing Auth. of Clackamas,* 994 F.Supp.

1253, 1256 (D.Or.1998); *In re Kenna Homes,* 557 S.E.2d at 796–97. The Court agrees with and adopts the ADA definition for purposes of the reasonable accommodation requirement of § 3604(f)(3)(B).

■ Plainly, most animals are not equipped "to do work or perform tasks for the benefit of an individual with a disability." *See Bronk,* 54 F.3d at 429 n. 6. There must instead be something—evidence of individual training—to set the service animal apart from the ordinary pet. *See id.; Fulciniti,* 1998 U.S. Dist. Lexis 23450, at *6–8; *Green,* 994 F.Supp. at 1256; *In re Kenna Homes,* 557 S.E.2d at 797. The primary handicap at issue in this case is mental and emotional (specifically, depression, anxiety and dizziness) rather than physical in nature. It therefore follows that the animal at issue must be peculiarly suited to ameliorate the unique problems of the mentally disabled. *See Proffer v. Columbia Tower,* No. 98–CV–1404–K (AJB), 1999 U.S. Dist. Lexis 16676, at *18–19 (S.D.Cal. March 4, 1999); *Green,* 994 F.Supp. at 1255. This is not a taxing requirement, however, and there are no federally-mandated animal training standards. *See Green,* 994 F.Supp. at 1255–56.

Prindable avers that "Einstein has been individually trained to provide emotional support[ ] and to alert me to any unusual circumstances." (Prindable Decl. ¶ 54); *see also id.* ¶¶ 7, 19. The record contains no additional admissible evidence of Einstein's qualifications as a trained service animal.[24] Indeed, in response to questions from the Court, Plaintiffs' counsel acknowledged that Einstein is not individually trained and possesses no abilities

---

**23.** The ADA defines "disability" as the FHA defines "handicap." *compare* 42 U.S.C. § 3602(h) *with* 28 C.F.R. 36.104. The terms are likewise treated as synonymous in this Order.

**24.** There is some evidence that Einstein's presence is comforting to Prindable, and that Einstein has performed certain assistance functions. *See* Prindable Decl. ¶¶ 55, 56; Dubois Decl. ¶¶ 21, 22; Plaintiffs' Exs. 4, 8, 10, 59.

unassignable to the breed or to dogs in general.[25]

"Obviously, a dog cannot acquire discernable skills as a service dog without some type of training." *In re Kenna Homes*, 557 S.E.2d at 797. Unsupported averments from Prindable and slight anecdotal evidence of service are not enough (particularly in light of counsel's candid admission) to satisfy Plaintiffs' burden in opposition to summary judgment. *Cf. In re Kenna Homes*, 557 S.E.2d at 798. Plaintiffs needed something more—an affidavit detailing Einstein's training, a declaration from Einstein's veterinarian or a certificate from any licensed training school—to survive summary judgment. *See id.* at 797. Again, this is not a heavy burden. But the Court has searched the record and finds nothing that would lead a reasonable jury to conclude that Einstein is an individually trained service animal.

It also remains whether the AOAO's refusal to allow an exemption from article VI, § 11 caused Prindable to be denied equal use and enjoyment of unit 102. *See California Mobile Home II*, 107 F.3d at 1380. There is little evidence going to this question, but it follows that if there is no genuine issue of material fact as to whether Einstein is an individually trained service animal capable of assisting Prindable in a relevant way, there is likewise no genuine of issue of material fact as to whether the accommodation is necessary. In other words, if Einstein is not a proper service animal (as opposed to a pet), an exemption from article VI, § 11 for Einstein is not necessary to afford Prindable an equal opportunity to use and enjoy the dwelling.

## C. Reasonableness of the Accommodation

The third element requires Plaintiffs to show that the requested accommodation is reasonable. *See* 42 U.S.C. § 3604(f)(3)(B); *In re Kenna Homes*, 557 S.E.2d at 794. A reasonable accommodation "can involve changing some rule that is generally applicable so as to make its burden less onerous on the handicapped individual." *Hubbard*, 994 F.Supp. at 189 (quoting *Proviso Assoc. of Retarded Citizens v. Village of Westchester*, 914 F.Supp. 1555, 1562 (N.D.Ill. 1996)); *accord Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1502 (10th Cir.1995). But there is no "obligation to do everything humanly possible to accommodate a disabled person; cost (to the defendant) and benefit (to the plaintiff) merit consideration as well." *Bronk*, 54 F.3d at 429. Accordingly, a necessary accommodation will typically be considered reasonable "when it imposes no undue financial or administrative hardships on the defendant ... and when it does not undermine the basic purpose of the [challenged] requirement." *Hubbard*, 994 F.Supp. at 190 (alteration in original) (quoting *Proviso Assoc.*, 914 F.Supp. at 1562).

In most circumstances, waiving a no-pet rule to allow a disabled resident the assistance of a service animal is a reasonable accommodation.[26] *See Bronk*, 54 F.3d at 429; *Fulciniti*, 1998 U.S. Dist. Lexis

---

**25.** Plaintiffs' counsel suggested canines (as a species) posses the ability to give unconditional love, which simply makes people feel better. Although this may well be true, counsel's reasoning permits no identifiable stopping point: every person with a handicap or illness that caused or brought about feelings of depression, anxiety or low self esteem would be entitled to the dog of their choice, without regard to individual training or ability. And if certain people liked cats, fish, reptiles or birds better than dogs, there would be no logical reason to deny an accommodation for these animals. The test would devolve from "individually trained to do work or perform tasks" to "of some comfort." The FHA—a sweeping enactment—is not quite so broad. Certainly, "some type of training is necessary to transform a pet into a service animal." *In re Kenna Homes*, 557 S.E.2d at 797.

**26.** This assumes, of course, that the animal is shown to be necessary to afford the plaintiff

23450, at *6–14; *Green,* 994 F.Supp. at 1255. Article VI, § 11 contemplates such an allowance for service animals, (Defendants' Ex. 1), and Defendants have not produced evidence showing a departure from that practice is warranted in this case.

## D. Refused to Make the Requested Accommodation

The final element is, of course, that the defendant refused to make the requested accommodation. *See* 42 U.S.C. § 3604(f)(3)(B); 42 U.S.C. §§ 3613(a)(1)(A), 3613(c)(1); *California Mobile Home II,* 107 F.3d at 1380. "[T]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person ... wants such an accommodation made." *Gavin v. Spring Ridge Conservancy, Inc.,* 934 F.Supp. 685, 687 (D.Md.1995). Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiffs' request, *Bryant Woods Inn,* 124 F.3d at 602, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law. *See In re Kenna Homes,* 557 S.E.2d at 796–99. Once allowed that opportunity, "'a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies grant-

ed in subsequent proceedings.'" *Groome Resources Ltd., LLC v. Parish of Jefferson,* 234 F.3d 192, 199 (5th Cir.2000). (quoting *Bryant Woods Inn,* 124 F.3d at 602).

Until an accommodation request is denied, there is no discrimination under § 3604(f)(3)(B). *See* 42 U.S.C. § 3604(f)(3)(B); *Groome Resources,* 234 F.3d at 199; *Bryant Woods Inn,* 124 F.3d at 602. Unless there is or is about to be an occurrence of discrimination, there is no cause of action. *See* 42 U.S.C. § 3613(c)(1). The denial can be either actual or constructive, "as an indeterminate delay has the same effect as an outright denial." *Groome Resources,* 234 F.3d at 199.

Prindable requested an accommodation concurrently with his submission of the first documents to the AOAO—Dr. Kalauawa's handwritten note dated May 17, 2000, and brief letter to the AOAO dated May 31, 2000. These documents were of limited value to Defendants.[27] So, too, Ms. Boyd's letter to CMI of June 21, 2000, (Defendants' Ex. 12), did not provide a basis from which Defendants could conclude that Prindable was entitled to house Einstein in unit 102 as a reasonable accommodation for his disability. Dr. Lum's letters of June 29, 2000, and August 5, 2000, are similarly deficient.[28] *See Hall,* 7 Fed.

an equal opportunity to use and enjoy the dwelling. *See Hubbard,* 994 F.Supp. at 190; *Trovato,* 992 F.Supp. at 497; *Anast,* 956 F.Supp. at 801.

27. The signature on the handwritten note is unclear and could easily have been forged. Furthermore, the note and letter are substantively deficient as Dr. Kalauawa did not disclose, for example, the nature of Prindable's disability. This made it impossible for the AOAO to determine whether Prindable was handicapped within the meaning of § 3602(h). *See Hall,* 7 Fed.Appx. 687, 689, 2001 U.S.App. Lexis 5718, at *3; *Hughes,*

2000 WL 518103, *2, 2000 U.S.App. Lexis 8499, at *4–5.

28. Neither Ms. Boyd's "brief assessment" nor Dr. Lum's letters of concurrence provided, for instance, a basis from which Defendants could conclude that a service animal was necessary to afford Prindable an equal opportunity to use and enjoy his dwelling, *see Proffer,* 1999 U.S. Dist. Lexis 16676, at *18–19, or that Einstein was such a service animal. *See Bronk,* 54 F.3d at 429. These are separate matters from the issue of whether Prindable is handicapped. Viewing the evidence (and all inferences reasonably drawn therefrom) in the light most favorable to Prindable, the let-

Appx. 687, 689, 2001 U.S.App. Lexis 5718, at 3; *Hughes,* 2000 WL 518103, *2, 2000 U.S.App. Lexis 8499, at *4–5; *Bronk,* 54 F.3d at 429; *Sporn v. Ocean Colony Condo. Ass'n,* 173 F.Supp.2d 244, 250 (D.N.J. 2001); *In re Kenna Homes,* 557 S.E.2d at 798–99.

"In order to show that the disabled person needs the assistance of a service animal ... it is reasonable to require the opinion of a physician who is knowledgeable about the subject disability and the manner in which a service dog can ameliorate the effects of the disability." *In re Kenna Homes,* 557 S.E.2d at 799. The foregoing letters do not provide a basis

from which Defendants could make this determination. Accordingly, Defendants had no meaningful opportunity to consider Prindable's request for a reasonable accommodation before Mr. Morris' July 18, 2000 letter granting a temporary exemption.[29] Nor is a period of less than two months from the first request for an accommodation an "indeterminate delay" under the circumstances. *Cf. Hall,* 7 Fed. Appx. 687, 689, 2001 U.S.App. Lexis 5718, at * 3; *Hughes,* 2000 WL 518103, *2, 2000 U.S.App. Lexis 8499, at *4–5; *Proffer,* 1999 U.S. Dist. Lexis 16676, at *18–19. Indeed, Defendants' careful review of Prindable's request is entirely consistent with the procedures followed in the HCRC investigation.[30]

ters from Ms. Boyd, Dr. Lum and, in particular, Dr. Sheehan are sufficient to create a genuine issue of material fact as to Prindable's status as an individual with a handicap. But that is only one of the relevant factors in determining whether Defendants denied Prindable a reasonable accommodation. The question of whether Defendants were presented with sufficient evidence to conclude that the accommodation requested was necessary remains. As to that issue, the evidence submitted in opposition to summary judgment falls short.

29. Plaintiffs indirectly challenge the condition that Prindable use the "shortest possible route" when entering and exiting unit 102 with Einstein. Plaintiffs have offered evidence that Prindable suffers from dizzy spells and has fallen while taking this route. (Plaintiffs' Exs. 11, 12). Plaintiffs argue that further accommodation (allowing Prindable to come and go with Einstein through any portion of the 2987 Kalakaua) is necessary. Prindable agreed to take the route that he now decries as degrading and dangerous, (Prindable Decl. 19), and it has been five months since the last averred fall. These facts substantially undermine Plaintiffs' argument. Furthermore, Prindable is free to enter and exit as he pleases when not traveling with Einstein. It is only when accompanied by Einstein that Prindable must use the pedestrian path through the garage and only when traveling alone that he is danger of falling. If Prindable is feeling dizzy, Dubois could take Einstein through the garage and

meet Prindable in front, or Prindable and Dubois could take the route together.

A service animal must be a *reasonable* accommodation, and nothing in the FHA precludes the imposition of appropriate rules and regulations designed to lessen the impact of housing a pet in a no pet building. *In re Kenna Homes,* 557 S.E.2d at 799. Accordingly, to succeed in his challenge to the shortest route rule, Prindable would need to show not only that he has a handicap that requires him to have Einstein, but that his handicap makes it necessary, as a reasonable accommodation, to travel alone with Einstein through the apartment complex by the path of his choice (rather than, for instance, Dubois or someone else taking Einstein by the shortest route while Prindable used—what would necessarily be—a longer route). There is no evidence that would lead a jury to so find.

30. The HCRC is not, of course, the polestar for permissible FHA investigative practices. It is, however, notable that Mr. Chang—in possession of the aforementioned letters, as well as letters from Dr. Sheehan—did not simply declare Prindable to be handicapped and entitled to an exemption from article VI, § 11. Mr. Chang instead requested an interview with the authors and at those interviews asked detailed questions concerning the nature of Prindable's disability and the necessity of a service animal. (Plaintiffs' Exs. 15, 17). Prindable and Dubois apparently had no objection to this process when conducted by the HCRC as opposed to the AOAO.

In any event, there is no evidence that Defendants ever denied Plaintiffs' request for a service animal. *See United States v. Hillhaven Corp.,* 960 F.Supp. 259, 264 (D.Utah 1997). Beginning with their response to Dr. Kalauawa's May 17, 2000 letter, the AOAO merely requested additional, appropriate information from Prindable and his treating physicians.[31] Landlords are not precluded from inquiring into and verifying the asserted handicapped or the necessity of the accommodation sought. *In re Kenna Homes,* 557 S.E.2d at 799. And, as discussed, the information sought was substantially similar to that utilized by Mr. Chang in conducting his investigation for the HCRC. The Court finds no evidence to indicate that Defendants were unwilling to reasonably accommodate Prindable if shown to be necessary for his equal use and enjoyment of unit 102.

In fact, the AOAO preliminary granted Prindable's request for accommodation on July 18, 2000, and officially on August 10, 2000, pending the outcome of the HCRC investigation. Prindable's handicap and entitlement to reasonable and necessary accommodation may well have been confirmed through the HCRC investigation, but he voluntarily abandoned that process in favor of litigation. As Prindable acknowledges, when he selected this course, he had not yet been denied a reasonable accommodation; Prindable was in fact enjoying the requested exemption on a tentative but extended basis. *See* Prindable Decl. ¶ 31. Nothing produced by Plaintiffs indicates that Prindable subsequently renewed his request for an accommodation or that such a request would have been ignored. Indeed, the evidence shows quite the opposite: as of at least January 29, 2003—five months into this action—Prind-

able continued to receive the accommodation purportedly sought.

Plaintiffs' case is therefore missing another fundamental element. *See Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 260 (1st Cir.2001); *United States. v. Village of Palatine,* 37 F.3d 1230, 1233 (7th Cir. 1994); *cf. California Mobile Home II,* 107 F.3d at 1380; *Tsombanidis v. City of West Haven,* 129 F.Supp.2d 136, 160–61 (D.Conn.2001). Until Prindable's request for a reasonable accommodation is denied, Plaintiffs have not been discriminated against. *See* 42 U.S.C. § 3604(f)(3)(B). Unless there is or is about to be an occurrence of discrimination, Plaintiffs do not have a cause of action. *See* 42 U.S.C. § 3613(a)(1)(A).

**E. Summary**

No genuine issues of material fact remain with respect to Dubois' FHA claim for failure to make a reasonable accommodation for his handicap. Genuine issues of material fact remain as to whether Prindable is handicapped, but there is no evidence that would lead a reasonable jury to conclude that Einstein is an individually trained service animal and, therefore, nothing to show that an accommodation for Einstein may be necessary to afford Prindable an equal opportunity to use and enjoy the dwelling. There is likewise no evidence of discrimination in violation of § 3604(f)(3)(B), because Defendants have not denied Plaintiffs' request for a reasonable accommodation.

For those reasons, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiffs' FHA claims for failure to make a reasonable accommodation.

---

**31.** Plaintiffs cite 24 C.F. § 100.202 (2002) in support of their argument that Defendants' inquiries were improper. Section 100.202 is plainly inapplicable to a § 3604(f)(3)(B) reasonable accommodation request.

## II. *Plaintiffs' Motion for TRO*

On June 3, 2003, Plaintiffs filed the instant Motion for TRO. Plaintiffs request an order directing that:

1. The defendants immediately rescind their egregious, deliberate, discriminatory and unreasonable demand that plaintiff use only the[ ] "disabled only[ ]" route dictated by the defendant AOAO when plaintiff enters and exits his residence with his federally protected animal;

2. The defendants are enjoined from interfering with [P]laintiffs' use and quiet enjoyment of their unit and all common areas of the project;

3. [D]efendants cease all eviction attempts against [P]laintiffs;

4. [D]efendants be enjoined from engaging in further acts of intimidation, retaliation and coercion against the [P]laintiffs;

5. That [D]efendants comply with … Prindable's requests for reasonable accommodations due to a disability, and cease their continuing campaign of discrimination and harassment pretext [sic] on an illegal inquiry into the nature and severity of [Prindable's] disability[;]

6. [P]laintiffs be allowed to use all common areas and not relegated to what is an unequal, separate and discriminatory entrance outlawed by the [FHA;]

7. Defendants allow [P]laintiff[s'] federally protected service animal to remain in their unit and at the project and cease their ever[-]escalating and endless inquiry into the nature and severity of [P]laintiffs' disability;

8. [D]efendants be enjoined from further[ ] baseless, illegal inquiry into the protected medical records of [Prindable; and]

9. For such other relief as this [C]ourt deems appropriate and necessary.

(Motion for TRO, at 7–9).

 To obtain a temporary restraining order "a party must demonstrate either: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief." [32] *Makua v. Rumsfeld,* 163 F.Supp.2d 1202, 1215 (D.Haw.2001). The hardship evaluation calls upon the Court to balance competing claims of injury and the effect that a grant or denial of injunctive relief would have on the parties and the public interest. *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988).

In light of the Court's ·analysis of Plaintiffs' FHA claims, it can hardly be said that Plaintiffs have demonstrated probable success on the merits. Indeed, the Court has granted summary judgment in favor of Defendants on Plaintiffs' reasonable accommodation request under the FHA. As discussed ·above, Defendants did not violate the FHA by failing to grant Dubois or Prindable an exemption from article VI, § 11, or by conditioning approval to house Einstein in unit 102 upon the rules stated in the letters of July, 18 2000, and August 10, 2000.

In any event, there is no evidence of irreparable harm or even significant hardship to Plaintiffs. Plaintiffs continue to reside with Einstein in unit 102 and presumably will do so at least until the state court action is resolved. Whatever alleged hardship to Plaintiffs might have otherwise been rectifiable by this Motion for TRO should have been brought to the Court's

---

**32.** The standard for granting a temporary restraining order is identical to the standard for granting a preliminary injunction. *Hawaii v.* *Gannett Pac. Corp.,* 99 F.Supp.2d 1241, 1247 (D.Haw.1999).

attention ten months ago when the action was filed or, at least, five months ago when the last averred fall occurred. Such a lengthy delay, when there has been no change in the relevant factual circumstances, cuts decidedly against a finding of harm or hardship—irreparable or otherwise. Conversely, restricting Defendants' power to investigate Prindable's accommodation request would significantly impair their defense in this action and their ability to litigate in state court, thereby imposing a palpable and unwarranted hardship.

 Finally, the second, third and, to a lesser extent, seventh prayers in Plaintiffs' Motion for TRO—the focus of much of the argument—effectively ask the Court to halt the state court action. Absent extraordinary circumstances, however, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), prevents the Court from granting injunctive relief that would interfere with a pending state court proceeding, *Green v. City of Tucson*, 255 F.3d 1086, 1093 (9th Cir.2001), when that proceeding is (1) ongoing, (2) implicates important state interests and (3) provides the plaintiff an adequate opportunity to litigate his federal claims.[33] *Hirsh v. Justices of the Supreme Court*, 67 F.3d 708, 712 (9th Cir.1995). "If the circumstances giving rise to Younger abstention apply, the district court must dismiss the action." *Baffert v. California Horse Racing Board*, 332 F.3d 613, 617 (9th Cir.2003)(pursuant to Rule 36–3(a) of the

Ninth Circuit Rules, the Court is not relying on this unpublished opinion for authority).

The unit 102 ownership dispute is approaching its second anniversary. The issue of whether Dubois holds title to unit 102 or the AOAO is entitled to an order of ejectment presents an important question of state law. The matter is ongoing and, indeed, Plaintiffs previously petitioned the state court for an order enjoining the nonjudicial foreclosure. (Defendants' Second Ex. 5). A restraining order would interfere with the proceeding. *See Baffert*, 332 F.3d at 618. Finally, Plaintiffs are able to vet their federal claims without this Court wading into the issues involved in the state proceeding. Accordingly, the Court abstains from enjoining the state action and to the extent the Complaint asks the Court to interfere with the state proceeding, those prayers are dismissed without prejudice.

For those reasons, the Court DENIES Plaintiffs' Motion for TRO.[34]

## CONCLUSION

The Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment. The Court concludes that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law as to Plaintiffs' claim under the Fair Housing Act for failure to make a reasonable accommoda-

**33.** Although *Younger* abstention initially applied only to state criminal proceedings, it has since been extended to civil action if the case implicates "important state interests." *Middlesex County Ethics Committee v. Garden, Etc.*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

**34.** Plaintiffs filed a notice of hearing their Motion for a Preliminary Injunction on June 13, 2003. Plaintiffs did not attach a memorandum in support. They rely instead on the arguments presented in favor of the Motion

for TRO. Having granted Defendants Motion for Summary Judgement as to Plaintiffs' reasonable accommodation claims under the FHA, denied Plaintiffs' Motion for TRO and abstained from deciding certain prayers under *Younger*, the Court sees no reason to consider the same issues and arguments in a new motion reviewed under an identical standard. Accordingly, the motion will be taken off calendar unless the parties present the Court with persuasive reasons to move forward with the hearing.

tion. The other causes of action alleged in the Complaint are not properly before the Court and, therefore, Defendants' Motion for Summary Judgment is DENIED in remaining part. This denial is without prejudice to a subsequent dispositive motion.

The Court also DENIES Plaintiffs' Motion for Temporary Restraining Order. Plaintiffs have not demonstrated a likelihood of success on the merits, there is no evidence of irreparable harm and the balance of hardships favors Defendants.

Finally, the Court abstains from either considering the dispute as to who holds title to unit 102 or enjoining the ongoing state court proceeding. To the extent the Complaint asks the Court to interfere with the state proceeding, those prayers are dismissed without prejudice

IT IS SO ORDERED.