# Illinois Official Reports

## Appellate Court

---

### *People v. Tapley*, 2020 IL App (2d) 190137

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID J. TAPLEY, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-19-0137 |
| Filed | December 18, 2020 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 15-CF-545; the Hon. James S. Cowlin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Andrew S. Gable, of Chicago, for appellant.<br><br>Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE BRIDGES delivered the judgment of the court, with opinion.<br>Justices Hudson and Brennan concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, David J. Tapley, appeals his convictions of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1), (d) (West 2012)). He argues that the trial court erred in allowing the victim, R.L., to testify with a dog under the Americans With Disabilities Act of 1990, as amended (ADA or Act) (42 U.S.C. § 12101 *et seq.* (2018)), which is a matter of first impression in Illinois. Defendant also argues that the trial court erred in allowing testimony about R.L.'s suicidal thoughts. We affirm.

¶ 2                              I. BACKGROUND

¶ 3    On July 23, 2015, a grand jury indicted defendant on four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1), (d) (West 2012)). The charges alleged that defendant was 17 years of age or older and knowingly committed acts of sexual conduct against R.L. The first two counts alleged that R.L. was under 13 years old, and the last two counts alleged that she was over 13 but under 17 years old. Count I alleged that defendant touched her vagina and/or breasts between March 25, 2010, and March 24, 2012. Count II alleged that defendant touched her vagina between June 1, 2013, and August 31, 2013. Count III alleged that defendant touched her vagina on April 5, 2015. Last, count IV alleged that he touched her vagina and/or breasts on May 30, 2015.

¶ 4    In 2016, defendant sought to subpoena R.L.'s mental health records, and R.L.'s personal attorney filed a motion in opposition. On November 4, 2016, the trial court ordered that defendant could issue subpoenas for the records limited to the time period set forth in the bill of indictment. The subpoenas were to be returned to the trial court for an *in camera* inspection. On January 21, 2017, the trial court ordered that the records be limited to 2010 to 2015 and further limited to statements regarding defendant and the alleged abuse.

¶ 5    On March 7, 2017, the trial court entered an order stating that it had inspected the materials returned *in camera* and found them to be relevant and responsive to defendant's subpoenas. It stated that the records were to be disclosed only to defense counsel and the State and then returned to the trial court. On May 4, 2017, the trial court entered an order stating that defendant acknowledged receipt of the subpoenaed materials.

¶ 6    On May 17, 2017, defendant filed a motion to allow his expert witness to review R.L.'s medical records and conduct a psychiatric examination. He stated in the motion that R.L. had been diagnosed with post-traumatic stress disorder (PTSD) by her doctors, whom he named. He further stated that "[m]edical records and reports by the above referenced medical professionals regarding witness and alleged victim R.L. have been tendered to the Defendant."

¶ 7    On October 19, 2017, the trial court ruled that the defense was not entitled to have R.L.'s mental health records or have her examined by a mental health expert if the State was not seeking to have a mental health expert testify.

¶ 8    On November 28, 2017, the State filed a motion *in limine* to allow R.L., who was 16 years old at the time, to testify in the presence of her "facility dog."[1] The State alleged that R.L.

_____

[1]The term "facility dog" appears in section 106B-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/106B-10 (West 2018)), while the Code of Federal Regulations, which implements the ADA, refers to a "service animal," specifically a dog (28 C.F.R. § 35.104 (2019)). The trial court found that R.L.'s dog qualified as a "service dog" under the ADA. In what follows, "service dog" generally

- 2 -

suffered from PTSD as a result of defendant's abuse and that R.L. had a facility dog that accompanied her everywhere. The State alleged that R.L. had previously suffered from PTSD episodes that affected her ability to go to school and communicate effectively but that the use of the facility dog had enabled her to attend school again. The State alleged that it had reason to believe that R.L. might suffer a PTSD episode while testifying that would prevent her from reasonably communicating with the jury. The State further alleged that the use of the facility dog and/or closed circuit television would help ensure that she would not have a PTSD episode during the trial and would limit any further emotional distress to her.

¶ 9     In defendant's response, he argued that there was no evidence that R.L. suffered from PTSD, and he denied that a facility dog would help her cope with PTSD. Defendant further argued that a 16-year-old could fully understand the nature of the court proceedings, that there was no evidence that the dog was a graduate of an assistance-dog organization, and that allowing R.L. to have a dog with her would prejudice the jurors against defendant and deny him the right to a fair trial.

¶ 10     The State withdrew its motion *in limine* on March 1, 2018. At a hearing on March 15, 2018, defense counsel stated that he learned that the State was planning to have R.L. testify with the dog present under the ADA. The trial court stated that it was aware that such a request had been made to James Wallis, the trial court administrator and disability coordinator. The trial court further stated:

> "There are very few things that can be done from the Court's perspective pertaining to that. What I mean by that is if, in fact, there is a disability, you can't even ask what the disability is. The ADA does allow a service dog, and I think that's what you're getting to. She has made that request to court administration."

On March 23, 2018, defendant filed a motion *in limine* arguing that dog's presence would unduly prejudice him because there was no evidence that R.L. suffered a disability covered by the ADA or that the dog in question was a service dog.

¶ 11     A hearing on defendant's motion *in limine* took place on April 5, 2018. At the beginning of the hearing, the trial court stated that if it "[found] out that it [was] an actual service dog, not a comfort dog, the Court [was] going to have to make a reasonable accommodation." Wallis testified that his responsibilities included monitoring access to the courthouse for people with disabilities. Peggy L., R.L.'s mother, contacted him about three months prior requesting that a service animal be present for R.L.'s testimony. According to an attorney general manual for court disability coordinators, Wallis was permitted to ask only two questions, those being whether the animal was required for a disability and whether it performed work for the individual. Peggy answered these questions in the affirmative, saying that the dog assisted in coping with a mental illness. In court, Wallis admitted that, in situations where it was not apparent what the nexus was between the disability and the service animal, the manual allowed him to ask what the "functional limitation" was but that he did not do so. Rather, the nexus between the dog and the disability was readily apparent to him.

¶ 12     Defense counsel argued that there was no evidence that R.L. had a mental disability and that there was no explanation as to what the dog was trained to do to help cope with the mental disability. The State argued that defendant did not have standing to challenge Wallis's decision

refers to a dog that qualifies as an assistance animal under the ADA, while "facility dog" generally refers to a dog that qualifies as an assistance animal under the law of Illinois or another state.

- 3 -

or the accommodation. The trial court stated that Wallis had yet to make a written decision pertaining to R.L.'s request and that, depending on that writing, the trial court would determine if it was going to make an accommodation. The trial court stated that, if it decided to make an accommodation, it would have a separate court date where the dog would be brought in so that it could determine the appropriate accommodation for R.L. while ensuring that defendant received a fair trial.

¶ 13 At a hearing on August 22, 2018, the trial court stated, "I've reviewed the matters and received the information from our coordinator, and the Court will allow a service dog to be present." It stated that the dog should be brought in on August 24 to determine a reasonable accommodation. R.L.'s mother requested that, if R.L. had to come in that day, defendant should not be present, as R.L. had PTSD. The trial court responded that it just needed the dog to come in with someone who could control the dog. Peggy stated that R.L. and the dog were a service team, that they had not been separated since becoming a team, and that only R.L. could legally take the dog out in public. The trial court stated that it also had to look out for defendant's rights to make sure that he received a fair and impartial trial, that defendant had a right to be present, and that, if the only way that the dog could be present was with R.L., she would need to come. Peggy stated that she would not be bringing R.L. because it would very likely cause a dissociative episode. The trial court stated that if the dog were not brought in, it would not be allowed at trial. Peggy stated that she would get a civil attorney. The trial court responded that it had made its ruling and she could do what she thought she needed to. Defense counsel asked if the trial court had received information from Wallis that differed from his testimony. The trial court replied, "Well, I'm telling you the Court's satisfied that there is a disability covered by the ADA and that the dog is a service dog."

¶ 14 R.L. and the dog were present in the courtroom on August 24, 2018. The trial court stated that it had installed a gate on the witness stand that would be closed when R.L. testified, such that the jury would not be able to see the dog when it sat next to R.L. The trial court stated that the dog should not go on R.L.'s lap. R.L. stated that getting on her lap was one of the dog's "commands" when R.L. was anxious. R.L. stated:

"Well, based on how I'm feeling right now, I can tell she's probably going to go up at least once. I'm not going to tell her to, but that's just one of her commands that she has and that she's trained to do."

The trial court stated that it understood but that they were going to do the best that they could. It stated that R.L. could be seated with the dog for a few minutes to relax before the jury was brought in and before questioning started. It stated that, when R.L. completed her testimony, it would have the jury leave the courtroom before R.L. and the dog got up. The record indicates that the dog sat on R.L.'s lap one time while they were discussing the issue. The State described the dog as medium-sized and stated that it did not think that they could avoid the jury noticing the dog. The State additionally stated that it did not think that there was any way to get around the dog getting on R.L.'s lap, as that was part of the dog's "work" in assisting her with her disability. The trial court repeated that it understood and said that they were going to try to minimize it as much as possible.

¶ 15 Testimony in defendant's jury trial began on September 18, 2018. Before opening statements, the parties and the trial court discussed the jury instruction about the service dog. Defense counsel stated that his proposed instruction was "to a great extent" the same language as the State's proposed instruction, with the addition of one sentence. The trial court stated that

it would add part of the additional sentence. Defense counsel did not object to the trial court's final instruction, which it read to the jury, as follows:

> "Ladies and Gentlemen of the Jury, I want to instruct you at this time that the witness has a service dog with her while she testifies.
>
> You are not to draw any inference in favor or against either side because of the dog's presence. And the focus of your attention should be on the testimony of the witness.
>
> The presence of the service dog in the courtroom shall not be considered in any way in the jury's deliberations or verdicts."

¶ 16    R.L. then provided the following testimony. She was 17 years old and a junior in high school. She had been living in the same house since she was four years old. Defendant, who was her uncle, lived with her aunt, Theresa, about two blocks from her house. They had been living in the neighborhood longer than she had, and they did not have children.

¶ 17    When R.L. was eight or nine years old, she was part of a church children's choir, which met Tuesday evenings. Defendant played guitar for the choir, and he would drive her home afterwards. Defendant would check that she was buckled in properly in the back seat, and at some point, he put his hand up her shirt and asked if it was okay. R.L. said yes because she did not realize that it was unusual. After that day, he started touching her breasts and her genitals when checking her buckle. He would then give her candy with nuts that she otherwise could not have at home because one of her younger brothers was highly allergic to nuts.

¶ 18    During summers between fourth and seventh grades, R.L. went on bike rides with defendant at 6 or 6:15 a.m. on weekdays, before he went to work. Her brother P.L., who was two years younger, would also go. The rides lasted between 30 and 45 minutes. They stopped at a certain spot for breaks, and defendant would take out candy, computer tablets, and a jacket from his bike bag. He would have R.L. sit on his lap or next to him, cover her with the jacket, and put his hand down her shirt and underwear. During this time, P.L. would be busy playing on the tablet.

¶ 19    Defendant and Theresa usually hosted family holiday parties. In addition to R.L.'s five-member family, her grandmother, her Aunt Sue, her Uncle Steve, her Uncle John, John's girlfriend, and two cousins would also attend. During the 2015 Easter party, the adults were hanging out in the kitchen and the family room. The kids and defendant were hanging out in the "bonus room" at the top of the stairs. Defendant was sitting next to R.L. on the couch, and he used a blanket to cover her. Then he touched her on her breasts and genitals, under her clothing. He rubbed her vagina, and at times he would pull his hand out, smell it, and lick his fingers. While this was happening, the other kids were playing games on their phones.

¶ 20    R.L.'s family had a party in May or June 2015 to celebrate her eighth-grade graduation. The same family members attended, except one cousin who was sick. The adults were in the kitchen, and defendant and the kids were in the living room. The kids were playing on their phones, and R.L. was seated next to defendant on the couch. Defendant used a pillow to cover R.L. and touched her breasts and genitals with his hands, under her clothes. Eventually she could not stand it and went upstairs and pretended to go to sleep. R.L. identified photographs of her and defendant's houses.

¶ 21    When R.L. was in middle school, she took an early bus to band rehearsal three or four days a week. Defendant would bike over to the bus stop and wait with her. One time between sixth

and seventh grade, while R.L. was waiting at the bus stop with defendant, R.L. asked defendant to stop touching her. Defendant first said that he would but later started doing other things, such as "he would hurt himself in front of" her and say that he would stop only if she let him touch her. He would also talk about drinking at work and wanting to kill himself, indicating that it was her fault. Defendant said that not touching her was like holding a big candy bar in front of someone and not letting the person eat it. Defendant gave gifts to R.L. such as candy, books, dresses, and a bike that he fixed for her.

¶ 22    When asked how the abuse was discovered, R.L. replied:

> "I met some friends online. And eventually everything that was going on drove me to the point where I wanted to kill myself because I couldn't—"

The defense objected, and the trial court sustained the objection, instructing R.L. to listen to the question and answer the question. R.L. said that she told some people online about the abuse. The prosecutor asked what happened next, and R.L. replied, "I got to a point where I wanted to kill myself and—." The defense again objected, and the trial court sustained the objection. The prosecution then asked if the police came to her house at some point, and R.L. answered in the affirmative.

¶ 23    On cross-examination, R.L. admitted that P.L. and one of her cousins also went home from choir with her in defendant's car, but she testified that there was a period of time when neither of them went to choir and she was alone with defendant in the car. She further testified that in a forum on a website called Noteflight, which was about music, she told people that an uncle had abused her. People from the forum called the police, and the police showed up to R.L.'s house on June 4, 2015, to her surprise. R.L. had "hoped" that the police would learn about her story, but when they actually showed up, she was not "ready" to name the abuser. A few days later, R.L. told an investigator at the Child Advocacy Center that defendant was the abuser.

¶ 24    During cross-examination, the following exchange occurred:

> "[DEFENSE ATTORNEY]: Judge, I would ask that the dog be placed on the—
> THE COURT: If—if—if the dog could go down, that would be fine so that the dog doesn't stand up and block your face. Okay?
> THE WITNESS: Okay.
> THE COURT: You may proceed."

¶ 25    After cross-examination, the State asked for a sidebar. It stated that the defense brought up the issue of the Noteflight forum and therefore opened the door to questioning about what R.L. was discussing in the forum. The trial court denied the request, saying that it did not want to get into collateral issues and that R.L. never testified what she said or did in the forum, so it would not allow questions about it.

¶ 26    On redirect examination, R.L. testified that she hoped that the abuse would "come out" after revealing it on the Noteflight forum:

> "[b]ecause [she] was in a place that [she] couldn't imagine continuing on with the abuse continuing. And while [she] didn't have the strength to tell somebody in charge [herself], [she] really desperately hoped somebody would so that it would all stop and be over."

R.L. was shocked when the police showed up and was not ready to tell an authority figure what was going on. R.L. hoped that the abuse would be discovered but did not think that it would. "[She] thought [she'd] be dead before it came out." The defense's objection to this statement

was overruled. R.L. said that she was scared and thought that she would get in trouble if she revealed what happened, and it made her feel like a bad, tainted person. R.L. also did not want to break her family apart, and "it broke [her] heart when it did."

¶ 27    P.L., age 15, provided consistent testimony regarding the bike rides with R.L. and defendant. P.L. additionally testified that defendant had a red coat that he would put on the ground when it was wet, or put on one of them if it was cold outside. They usually sat in a triangle, and P.L. did not pay attention to what defendant was doing because "nothing seemed like it was important to pay attention to."

¶ 28    Detective Kevin Doherty of the Crystal Lake Police Department testified that he was assigned to take over the investigation from another officer. That officer had met with the family and was told about issues R.L. was having, "specifically being suicidal." Defense counsel objected to this testimony, and the trial court overruled the objection. Doherty then testified that someone out of state had contacted the police to report that R.L. "had been online making suicidal comments." R.L. did not feel comfortable talking about the abuse when the police first arrived, but she talked to her mother afterwards, and Peggy contacted the police later that night. R.L. was interviewed five days later.

¶ 29    Defendant voluntarily came to the police station on June 11, 2015, and Doherty interviewed him. Defendant said that he really enjoyed spending time with his nieces and nephews. Defendant agreed that he had dropped R.L. off after choir practice about four to five years prior; that she would sit in the backseat and he would check to make sure that she was wearing her seatbelt; that he had candy in the car; that he hosted holiday parties at his house, including for Easter; that he would spend time with the kids in the playroom on the second floor of the house during the parties; that he was present at R.L.'s eighth-grade graduation party; that he had taken bike rides with R.L. and P.L. in the mornings before work; that they would take a 10- or 15-minute break during the bike rides, during which time the kids would play with the computer tablet he brought; and that he had a red jacket that he would put on the ground or cover the kids with if they were cold. He denied ever abusing R.L.

¶ 30    On cross-examination, defense counsel asked whether there was some indication that R.L. was threatening suicide, and Doherty answered in the affirmative. He did not know if she ever tried to commit suicide. Doherty did not contact anyone from outside of R.L.'s immediate family, other than defendant.

¶ 31    Peggy testified as follows. R.L. was in the church children's choir from about 2010 to 2012, when she was in fourth or fifth grade. R.L.'s cousins also participated in the choir. At some point, defendant volunteered to play the guitar for the choir, and he would drive R.L. home. R.L. did not need help buckling her seatbelt at that age. Defendant frequently bought gifts for R.L. that were not for a particular holiday, including buying her dresses when she was in third or fourth grade. Defendant took R.L. on bike rides early on weekday mornings, and they would be gone over one hour. Defendant also waited with R.L. for the band bus to come. He would give candy to all of the children. At R.L.'s eighth-grade graduation party, R.L. was supposed to be with the kids in the toy room. Peggy went upstairs a few times during the party to make sure that everyone was okay, and she kept finding R.L. in her bedroom with defendant. Later, they both came down to the living room. R.L. was under a blanket, which Peggy thought was odd because it was so warm.

¶ 32    Samuel L., R.L.'s father, testified that defendant would wait with R.L. for the band bus; that defendant went back and forth between the first and second floor during the 2015 Easter

party; that other adults went upstairs, too, but did not spend as much time there as defendant; and that defendant favored R.L. over her brothers but had a good relationship with all three of them.

¶ 33    Defendant moved for a directed verdict, which the trial court denied. Sue C. then provided the following testimony. She was Theresa and Peggy's sister and had two children. Her daughter M.C. joined the church choir in fall 2008. The choir needed a guitar player, and Sue asked defendant to join in November 2008. R.L. did not join until fall 2009, and P.L. joined in fall 2010. Defendant would drive M.C. home after choir practice, and he later added R.L. and P.L. to the carpool. It was possible that there were times when R.L. and defendant were at choir and M.C. was not. After R.L. quit around November 2010, defendant still participated in the choir and drove M.C. home. To Sue's knowledge, there was always candy in defendant's car. Sue's children went on bike rides with defendant, and he would have a jacket or sweater with him so they would not have to sit on the wet ground if they stopped somewhere. Sue was at the Easter party and went up to the loft area on the second floor two times. She did not observe anyone covered in a blanket, but she did not go far enough up the stairs to see their laps. At R.L.'s graduation party, R.L. was on the main level. There was a "tiff" with Peggy, and afterwards R.L. went upstairs. Sue never saw R.L. and defendant in the living room.

¶ 34    M.C. testified that she was Sue's daughter and was 18 years old. M.C. started going to the choir practices before R.L. joined. M.C. did not remember anything unusual occurring during the rides home with defendant. He always had candy in the car. It was possible that there were times when R.L. was at choir without M.C. M.C. had gone on bike rides with defendant and various other family members, including R.L., and did not remember anything unusual happening. Defendant would give sweets to all of the kids during the rides. At the Easter party, the kids and defendant went to the loft area after dinner. Defendant sat on a desk chair by the computer, and R.L. sat with M.C. and M.C.'s sister on the couch. At the graduation party, everyone mostly congregated in the kitchen and the family room. At one point, M.C. was upstairs in R.L.'s room with R.L., defendant, and Theresa. Theresa asked R.L. to try on a swimsuit, and at that point defendant came downstairs.

¶ 35    K.C., M.C.'s sister, testified that she was 17 years old. At the Easter party, she sat between defendant and R.L. on the couch in the loft. There was a blanket on their laps. K.C. had gone on bike rides with defendant, M.C., R.L., and R.L.'s brothers. They would stop for a break, eat some candy, and play games on defendant's tablet or phone. Nothing unusual happened. K.C. had also gone on bike rides with just defendant.

¶ 36    Tina Marshall testified that she was at the graduation party and never saw R.L. and defendant sitting alone. When defendant sat on the couch in the family room, R.L.'s brothers were sitting on either side of him.

¶ 37    Ruth Palter, R.L.'s grandmother, testified that, at the graduation party, R.L. sat at the kitchen table with the adults for most of the afternoon. Defendant was in the family room playing games with P.L. and S.L., who was R.L.'s youngest brother. She did not remember any family events where defendant and R.L. were alone together.

¶ 38    Defendant testified as follows. He was 53 years old and worked as a senior desktop support technician. When defendant first joined the church choir in 2008, he would drive just M.C. home. She would sit in the back seat and buckle her seatbelt, and he would look to make sure that she was buckled. After R.L. joined the choir in 2009, defendant drove both R.L. and M.C. home. They would both sit in the back seat. P.L. joined the choir in 2010, and he would sit in

- 8 -

the back seat with R.L. while M.C. would sit in the front seat. M.C. missed some choir practices in November and December 2011 due to cheerleading, but defendant did not recall her missing any other practices. Defendant kept candy in the car and gave it to his nieces and nephews. Defendant denied ever touching R.L.'s breasts or genitals or touching her inappropriately in any way.

¶ 39    Defendant enjoyed bike riding, and R.L. and P.L. asked if they could come along. He never took R.L. on a bike ride by herself. Defendant went riding with them two or three times per week for two or three summers. After the first summer, S.L. also came. They would ride on the bike path for 15 or 20 minutes, stop at a grassy area that was next to the bike path and visible from the road, and rest for about 15 minutes. He would let the kids play games on his phone and give them candy, and they would drink water. Defendant brought a jacket to put on the ground if it was wet, but he never covered himself and R.L. with the jacket, nor did he ever touch her under the jacket. He would let one of the kids wear the jacket if he or she was cold. He had bought dresses for R.L. and had also bought clothes for P.L. and S.L.

¶ 40    After dinner at the Easter party, defendant went upstairs to the loft with the kids. Defendant sat next to K.C. on the couch, and R.L. sat on the other side of K.C. Defendant did not sit next to R.L., and he did not touch her. At R.L.'s graduation party, defendant went upstairs at one point to see what was going on with Theresa. Defendant later went to the family room and played games on phones with P.L. and S.L. He never sat alone with R.L. that day.

¶ 41    Defendant waited with R.L. at the bus stop because he did not like that she was waiting alone when it was dark outside. He acknowledged that her parents thought that it was okay for her to wait alone.

¶ 42    Defendant met with Doherty willingly when asked, but Doherty did not say what the meeting was about. When Doherty accused him of sexually abusing R.L., defendant was angry, shocked, and nervous about being accused of a serious crime. He had never touched R.L. inappropriately.

¶ 43    The State began its closing argument by stating, without objection, "I thought I'd be dead before it came out," referring to R.L.'s testimony about what she wrote on Noteflight. The State then stated that R.L. was shocked when the police showed up at her house and was not immediately ready to name her abuser. In rebuttal closing argument, the State again referenced the statement about being dead, without objection.

¶ 44    The jury found defendant guilty of counts I through III and not guilty of count IV. On October 9, 2018, defendant filed a motion for a new trial. His arguments included that, over his objection, testimony was elicited of R.L.'s alleged attempts to commit suicide as a result of his sexual abuse, prejudicing his right to a fair trial. He also argued that the trial court erred in allowing R.L.'s dog to be present at trial and that it was prejudicial because it evoked sympathy and pity for R.L. and misled the jury to believe that she suffered from a disability he caused. The trial court denied the motion on October 31, 2018.

¶ 45    During the sentencing hearing on December 20, 2018, Samuel testified in part as follows. R.L. was diagnosed with various conditions as a result of the sexual abuse, the most serious of which was PTSD. The other conditions included problems with sleeping, difficulty with short-term memory, and dissociation, in which stress and anxiety caused her to block out reality. R.L. had been hospitalized twice. She was receiving treatment and therapy and had been prescribed medications. At some point during the treatment, her pediatrician wrote her a prescription for a service dog. It took about 18 months to then obtain a dog because the dog's

training had to be tailored to R.L.; they received a dog in 2017. The dog helped R.L. function in society by alleviating the symptoms of her PTSD. For example, dissociating while walking down the street was dangerous, and the dog was trained to detect when R.L. started to "fade out." "[B]y using pressure," the dog would "bring her back." The cost of the dog and its care were considered medical expenses, and R.L.'s family had been compensated for the majority of the expenses through the Crime Victims Compensation Fund.

¶ 46 Peggy read a victim impact statement that similarly stated that R.L. suffered from PTSD, which included dissociative episodes, and that she took medications to mitigate her symptoms.

¶ 47 In R.L.'s victim impact statement, she stated that she was not diagnosed with PTSD until right before freshman year but that she had signs of PTSD before then, including in seventh grade.

¶ 48 On January 3, 2019, the trial court sentenced defendant to five years' imprisonment on count I and three years' imprisonment on count II, to be served concurrently. It sentenced him to 24 months' probation on count III, commencing upon his release from the Department of Corrections, concurrent with his terms of mandatory supervised release. The trial court also ordered defendant to pay restitution. Defendant filed a motion to reconsider, which the trial court denied on February 21, 2019. Defendant timely appealed.

¶ 49                                          II. ANALYSIS
¶ 50                             A. The ADA and R.L.'s Service Dog

¶ 51 Title II of the ADA prohibits public entities from discriminating against individuals with disabilities. 42 U.S.C. § 12132 (2018) ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity"). The Code of Federal Regulations implements the Act. *Id.* § 12134; 28 C.F.R. § 35.101 (2019). "Disability" means "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual." 28 C.F.R. § 35.108(a)(1)(i) (2019). PTSD is listed as an impairment that substantially limits brain function. *Id.* § 35.108(d)(2)(iii)(K).

¶ 52 A "service animal" is defined as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." *Id.* § 35.104. Examples of work or tasks include, among other things, "helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors." *Id.* However, "[t]he crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition." *Id.* Where a service animal is involved:

> "[a] public entity shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal. A public entity may ask if the animal is required because of a disability and what work or task the animal has been trained to perform. A public entity shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. Generally, a public entity may not make these inquiries about a service animal when it is readily apparent that an animal is trained to do work or perform tasks for an individual with a disability (*e.g.*, the dog is observed guiding an

- 10 -

individual who is blind or has low vision, pulling a person's wheelchair, or providing assistance with stability or balance to an individual with an observable mobility disability)." *Id.* § 35.136(f).

¶ 53    Defendant argues that the trial court erred in allowing R.L. to testify with a dog under the ADA because (1) there was no showing that the dog was required under the ADA and (2) the ruling denied him a fair trial and impacted his confrontation rights. He argues that this issue should be reviewed *de novo* because the construction of the ADA presents a question of law.

¶ 54    Regarding the first point, defendant argues that the trial court should have made a "task or function inquiry" and asked R.L. if her dog was a service animal and what tasks the animal had been trained to perform. See *Brown v. Cowlitz County*, No. C09-5090 FDB, 2009 WL 4824010, at *3 (W.D. Wash. Dec. 9, 2009) (trial court's "task or function" inquiry to determine whether dog was *bona fide* service animal entitled to accompany the plaintiff into the courthouse was a permissible inquiry under the ADA); see also 28 C.F.R. § 35.136(f) (2019). Defendant maintains that the trial court did not explain the reasons for its findings that it was satisfied that there was a disability covered by the ADA and that the dog was a service dog. He points out that Illinois law defines a "facility dog" as "a graduate of an assistance dog organization that is a member of Assistance Dogs International" (725 ILCS 5/106B-10 (West 2018)), but he argues that no similar evidence was presented here. Defendant cites *Dilorenzo v. Costco Wholesale Corp.*, 515 F. Supp. 2d 1187, 1194 (W.D. Wash. 2007), where the court held that there were no violations of the ADA where store employees asked to whom the dog belonged and what tasks it performed or where the store's attorney asked whom the dog was trained to assist and what training it had received.

¶ 55    Defendant further argues that public entities are not required to take any action where it would fundamentally alter the nature of a "service." See 28 C.F.R. 35.164 (2019). He contends that a witness does not testify in a place where the general public is permitted and that allowing a complaining witness to testify with a dog fundamentally altered the nature of the trial. This is a fact-based inquiry (see *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 673 (2001)), but defendant argues that there was no inquiry before the trial court permitted the dog. Defendant maintains that the trial court instead relied on Wallis, who in turn relied on a hearsay conversation with Peggy, without R.L. testifying about how the dog was trained and how it specifically assisted her. Defendant argues that it was not enough for Peggy to say that the dog has been trained to assist with R.L.'s mental illness. See *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1256-57 (D. Haw. 2003) (in housing discrimination case, court granted summary judgment for the defendant where the record contained no admissible evidence of dog's qualifications as a trained service animal and the plaintiff's counsel acknowledged that the dog had not received any specialized training).

¶ 56    Defendant notes that Wallis relied upon a manual for court coordinators, but he argues that the manual was not law. He further argues that the manual itself states that the coordinator may ask if the animal is required because of a disability and question what work or task the animal has been trained to perform. See Office of the Attorney General, Opening the Bench and Bar to People with Disabilities: Manual for Court Disability Coordinators, https://illinoisattorney general.gov/rights/Manual_Court_Disability_Coordinators.pdf, at 23 (June 2019) [https:// perma.cc/L85F-SLME]. Defendant also asserts that the trial court could have asked more than the two questions referenced about the dog, as courts have repeatedly had to determine whether a dog is a *bona fide* service animal. See *Petrea v. Marriott International, Inc.*, No. 2:15-cv-

493-JRG-RSP, 2016 WL 9712001, at \*1-2 (E.D. Tex. Mar. 9, 2016) (magistrate judge recommended that the defendant's motion for summary judgment be granted where the plaintiff purchased his dog without a prescription or recommendation from a doctor or provider, the dog received no other training than the general training that the plaintiff provided, and the dog simply provided companionship). Defendant argues that under Wallis's and the trial court's view, any witness could testify with a dog, merely by stating that it was a service animal.

¶ 57    Further, defendant continues, it is unclear what, if anything, Wallis wrote in his decision to the trial court after the hearing on the issue, and defense counsel was rebuffed when he asked. Defendant argues that, to the extent that the trial court relied upon Wallis's private opinion without sharing it with defendant, we must reverse because a determination made by a judge upon private investigation or private knowledge, untested by cross-examination or the rules of evidence, might result in the denial of due process. See *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001). Defendant argues that the trial court was in an entirely different position from Wallis, was in control of the courtroom, and was required to balance defendant's rights. He maintains that this situation appears to be novel in that there is little to no case law on an alleged victim testifying with a service animal, as opposed to a support animal, but that "neither the State nor the trial court presented any support that the ADA provides lesser protections for a criminal defendant when a dog is present under the ADA rather than as an emotional support or facility dog."

¶ 58    Defendant further argues that there was no showing of a disability or a connection between the disability and the dog. He argues that, although the State argued that R.L. had PTSD in pretrial motions and there was testimony about this subject at sentencing, no testimony or evidence about PTSD was submitted to the trial court prior to its decision. Defendant argues that, even if R.L. suffered from PTSD, there was no specific showing of what tasks the dog was trained to perform or that they were related to the disability at hand. Defendant argues that Samuel testified at sentencing that the dog alleviated her symptoms, without explaining how. Defendant acknowledges that the State stated that one of the dog's tasks was that it "pats on [R.L.'s] lap and it alerts on her body," but he argues that this alone did not make the dog a service dog. See *Prindable*, 304 F. Supp. 2d at 1257 ("slight anecdotal evidence of service [is] not enough").

¶ 59    Defendant cites *Riley v. Board of Commissioners of Tippecanoe County*, No. 4:14-CV-063-JD, 2017 WL 4181143, at \*1 (N.D. Ind. Sept. 21, 2017), where the plaintiff claimed that he was improperly barred from entering a courthouse with his service dog. The court stated that there were genuine issues of material fact as to whether the plaintiff suffered from PTSD at the time but that the record did not contain sufficient evidence to demonstrate that the dog was a service animal under the ADA. *Id.* at \*4-5. The court stated that "having a calming effect on an individual, without more, does not render any animal a service animal under the ADA." *Id.* at \*7 (citing 28 C.F.R. § 35.104 (2016)). Defendant argues that in this case there was similarly no showing of a specific connection between R.L.'s disability and the tasks her dog was trained to perform, beyond merely providing a calming effect for R.L.'s PTSD, especially considering the State's initial claim that the dog was a facility animal that provided emotional support.

¶ 60    Defendant alternatively argues that R.L.'s rights under the ADA could not trump his right to a fair trial and that having the complaining witness testify with her dog created undue

- 12 -

sympathy. He argues that people have very strong attachments to animals, particularly dogs, and that this is even more pronounced for service animals. Defendant asserts that, by going through the ADA and Wallis, the State avoided the stricter requirements for facility dogs under section 106B-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/106B-10 (West 2018)). In addition to requiring that the dog be a graduate of an assistance-dog organization, it states that "the court shall take into consideration the age of the child or person, the rights of the parties to the litigation, and any other relevant factor that would facilitate the testimony by the child or the person." *Id.* Defendant argues that the statute has clear limitations on when a "facility" or comfort animal can be used, which recognizes the inherent prejudice to the defendant if the trial court fails to make certain findings. Defendant maintains that, without such findings here, his right to a fair trial was compromised.

¶ 61        Defendant contends that the dog's presence also impacted his ability to confront R.L., in that it blocked her face at least one time. He cites *Coy v. Iowa*, 487 U.S. 1012, 1020-21 (1988), where the United States Supreme Court held that the defendant's right to confrontation was violated when screens were placed in front of two child witnesses that blocked their view of the defendant and allowed the defendant to see only a dim view of them. Defendant argues that, although the situation in *Coy* was more extreme, here, the jury's view of the dog and the potential prejudice and sympathy were just as impactful. He further analogizes the jury's ability to see the dog to a case where the trial court improperly placed two podiums between the defendant and the witness, blocking the defendant's view of the witness. See *People v. Lofton*, 194 Ill. 2d 40, 61 (2000) ("The novel arrangement devised by the trial court, authorized neither by statute nor by common law, failed to ensure the reliability of the evidence by subjecting it to rigorous adversarial testing and, thus, failed to preserve the essence of effective confrontation."). Defendant also argues that the jury could have believed that the dog got on R.L.'s lap because she was telling the truth or that the defense was bullying her, and he notes that he was unable to cross-examine the dog.

¶ 62        Further, defendant continues, by telling the jury that R.L. had a service animal, the trial court essentially informed the jury that R.L. had a mental health issue due to him. He argues that he was unable to challenge her about her PTSD because the defense was not allowed to subpoena mental health records, which would have allowed him to impeach or mitigate the prejudicial nature of the dog.

¶ 63        Defendant argues that the error in allowing the dog was not harmless because the evidence was closely balanced. Defendant argues that this case essentially came down to credibility, and the State was allowed to engender sympathy by showing that R.L. needed a service animal because someone had harmed her. Defendant asserts that the fact that the jury found him not guilty of count IV shows that there were serious problems with R.L.'s credibility and thus that the inconsistent verdict was likely based on sympathy caused by the dog. According to defendant, the limited jury instruction was not enough to correct any error.

¶ 64        The State responds that the trial court did not err in allowing R.L. to testify with her service dog present. The State argues that this issue should be reviewed for an abuse of discretion, as the trial court had discretionary authority to control the mode and manner of evidence presentation in the courtroom. See Ill. R. Evid. 611 (eff. Oct. 15, 2015). The State argues that, to the extent that the trial court made factual findings, these would be reviewed under the manifest-weight-of-the-evidence standard.

¶ 65    The State argues that defendant has not cited any law for the proposition that the trial court was required to delve deeper into the exact function of R.L.'s service dog or provide additional information to defendant. The State argues that the trial court was correct in stating that if it found that the dog was a service dog, as opposed to a comfort dog, it could not inquire into the nature of the disability and had to make reasonable accommodations. See 28 C.F.R. § 35.136(f) (2019). The State argues that the federal cases cited by defendant, several of which are unpublished, generally involve situations where individuals were suing for being denied use of their dogs, which is not what occurred here. The State points out that crime victims have a constitutional right to be treated with fairness and with respect for their dignity and privacy and to remain free from harassment, intimidation, and abuse throughout the criminal process. Ill. Const. 1970, art. I, § 8.1(a)(1); see also 725 ILCS 120/4.5(c) (West 2018) ("[t]he court shall ensure that the rights of the victim are afforded"). The State argues that the trial court went out of its way to keep the dog out of the jury's view as much as possible to prevent focus on the dog and that it instructed the jury that the dog's presence should not be considered in any way in the jury's deliberations and verdicts. See *People v. Taylor*, 166 Ill. 2d 414, 437-39 (1995) (the jury is presumed to follow the trial court's instructions).

¶ 66    The State argues that, despite defendant's assertions to the contrary, the record is replete with information about R.L.'s disability and the function that the service dog played in assisting her. The State highlights that defense counsel himself had copies of R.L.'s mental health records. It further points out that additional information about the dog was brought out at the sentencing hearing.

¶ 67    The State further argues that R.L. testified in detail about the abuse defendant committed against her, and her credibility was bolstered by the fact that she did not go to the police to report defendant but, rather, the police came to her. The State claims that it is pure speculation by defendant that a single appearance by the dog during R.L.'s testimony so overwhelmingly impacted the jury members that they reached different verdicts than they otherwise would have.

¶ 68    As stated, the issue of a witness using a service dog under the ADA appears to be one of first impression in Illinois. Further, defendant has not cited, nor has our research revealed, a case from another jurisdiction that specifically addresses this issue.[2] There are numerous out-

---

[2]We may look to decisions of foreign jurisdictions as persuasive authority when there is no Illinois authority on an issue. *People v. Robledo*, 2018 IL App (2d) 151142, ¶ 15. Though distinguishable, two cases from other jurisdictions merit mention. In *Jones v. State*, 841 S.E.2d 112, 121 (Ga. Ct. App. 2020), the trial court allowed a victim to testify with his service dog present, though the victim did not request that the animal be allowed under the ADA. In *In re McDonough*, 930 N.E.2d 1279, 1282 (Mass. 2010), a prospective witness in a criminal case appealed an order of the district court finding her not competent to testify because of her impaired capacity to communicate orally, which was the result of a stroke. The witness argued, among other things, that the ruling violated her rights under the ADA. The Massachusetts Supreme Judicial Court held that she had no standing to appeal within the criminal case (*id.* at 1283) but, rather, had recourse to initiate a separate action (*id.* at 1288). However, it created guidelines for situations where there was a dispute concerning a witness's request for accommodation, which included that the judge should hold a hearing to inquire of the witness whether he or she has a disability that requires accommodation and what that accommodation would be. *Id.* at 1290-91. The judge is to make adequate findings to permit appellate review of a decision concerning a request for accommodation. *Id.* at 1291. Illinois does not have similar guidelines, though there is the Supreme

of-state cases discussing the use of facility dogs by witnesses, which largely present different considerations. See John J. Ensminger, Sherri Minhinnick, James Lawrence Thomas, & Itiel E. Dror, *The Use and Abuse of Dogs in the Witness Box*, 25 Suffolk J. Trial & App. Advoc. 1, 3-5, (2019) (stating that at least 31 states have implemented courthouse dog programs and listing court decisions from 11 states).

¶ 69   We begin by addressing the applicable standards of review. Interpreting the ADA and corresponding regulations presents a question of law, which we review *de novo*. See *Cigna v. Illinois Human Rights Comm'n*, 2020 IL App (1st) 190620, ¶ 23. When interpreting a statute, our primary objective is to ascertain the legislative intent, which is best indicated by the plain and ordinary meaning of the statute's language. *People v. Miles*, 2020 IL App (1st) 180736, ¶ 9. We construe regulations in the same manner. See *People v. Chiaravalle*, 2014 IL App (4th) 140445, ¶ 28.

¶ 70   That being said, we agree with the State that allowing R.L. to testify with a service dog falls within the trial court's discretion under Illinois Rule of Evidence 611 (eff. Oct. 15, 2015), which states:

> "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

Similarly, courts have held that "[t]he trial court's evidentiary rulings, which involve the court's oversight of the courtroom and maintenance of a case's progress, will not be reversed absent an abuse of discretion." *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 58; see also *People v. Pope*, 2020 IL App (4th) 180773, ¶ 38 (appellate court reviewed for an abuse of discretion trial court's decision to allow closed circuit testimony); *Jones v. State*, 841 S.E.2d 112, 121-22 (Ga. Ct. App. 2020) (trial court's decision to allow the victim's service animal to accompany him when he testified was within the trial court's discretion). An abuse of discretion occurs only where the court's ruling is fanciful, arbitrary, or unreasonable. *Wilson*, 2019 IL App (1st) 181486, ¶ 58.

¶ 71   Still, the particular subissue of whether the allowance of the service dog violated defendant's constitutional confrontation rights is a question of law, which we review *de novo*. See *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 40 (whether a defendant's right to confrontation has been violated is a question of law, subject to *de novo* review).

¶ 72   Many of defendant's arguments fall within the umbrella of asserting that the trial court did not question R.L.'s use of a service dog to the extent permissible under the ADA. However, one of the purposes of the ADA is to prohibit a public entity from discriminating against a disabled individual because of his or her disability. 42 U.S.C. § 12132 (2018). The ADA is to be construed broadly, and

> "[t]he primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of

Court of Illinois Policy on Access for Persons with Disabilities (eff. Aug. 3, 2012) https://courts.illinois. gov/SupremeCourt/Policies/DisabilityPolicy/disability-policy.pdf [https://perma.cc/U2JP-EF5L], which we mention later in the opinion.

- 15 -

'disability.' The question of whether an individual meets the definition of 'disability' under this part should not demand extensive analysis." 28 C.F.R. § 35.101(b) (2019).

¶ 73    In other words, the ADA is meant to protect individuals with disabilities, and any such individuals who believe that their rights have been violated may bring suit under the Act. All of the cases defendant cites in support of his position that the trial court should have questioned the use of the service dog in more depth are readily distinguishable from the present situation, as those cases involved disabled individuals bringing actions against entities for allegedly violating their right to have their service animals present. Here, in contrast, R.L. was allowed use of her service dog as requested. Accordingly, many of defendant's arguments, including that "neither the State nor the trial court presented any support that the ADA provides lesser protections for a criminal defendant when a dog is present under the ADA rather than as an emotional support or facility dog," are misdirected, as the ADA does not provide protections for nondisabled individuals like defendant. We further note that, as the appellant, defendant has the burden of showing error.

¶ 74    What defendant can do is assert that the trial court's actions violated his constitutional rights. He does so through his argument that the trial court's actions violated his confrontation rights, which we address later in the opinion, and through a more generalized argument that the trial court's actions violated his right to a fair trial. We examine his arguments through this lens.

¶ 75    As stated, where a service animal is involved:

> "[a] public entity shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal. A public entity may ask if the animal is required because of a disability and what work or task the animal has been trained to perform." *Id.* § 35.136(f).

The trial court held a hearing at which Wallis testified about Peggy's request to allow R.L. to testify with her service dog. The trial court subsequently received Wallis's written decision, after which it stated that it was "satisfied that there [was] a disability covered by the ADA and that the dog is a service dog."

¶ 76    Accordingly, it is clear from the record that defendant was informed that R.L. requested the use of a dog for a disability and that the trial court granted the request. Defendant argues that there was no showing that R.L. had a disability, but we note that, as "[a] public entity shall not ask about the nature or extent of a person's disability" (*id.*), defendant also would not be entitled to such information. Even otherwise, there is ample evidence in the record that R.L. claimed to have PTSD. In fact, on May 17, 2017, defense counsel filed a motion stating that R.L had been diagnosed with PTSD by her doctors and that he had medical records and reports from those doctors in his possession. The State later filed a motion *in limine*, which it subsequently withdrew, to allow R.L. to testify with a facility dog due to her PTSD. At the hearing on August 22, 2018, Peggy again stated that R.L. had PTSD. As stated, the regulations implementing the ADA provide that PTSD is an impairment that substantially limits brain function. *Id.* § 35.108(d)(2)(iii)(K).

¶ 77    Defendant argues that there was no evidence that the dog was a service dog, but the regulations implementing the ADA state that a public entity may ask only the two aforementioned questions "to determine whether an animal qualifies as a service animal." *Id.* § 35.136(f). "A public entity shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal." *Id.* Again, as the trial court was not

allowed to require proof that the dog was trained, it follows that defendant was likewise not entitled to such proof. We additionally note that at the sentencing hearing, at which the witnesses were subject to cross-examination, Samuel testified that R.L. was prescribed the dog by her pediatrician, that it took 18 months to obtain the dog because it had to be trained for her needs, and that the family had been compensated for the majority of the expenses through the Crime Victims Compensation Fund because the costs of the dog and its care were considered medical expenses. Defendant argues that information from the sentencing hearing is not relevant because it took place after the trial court had made its decision. However, we believe that in a situation such as this one, where defendant seeks a new trial based on an alleged violation of his rights,[3] we may examine the entire record to see if a reversal is warranted. *Cf. People v. Eubanks*, 2019 IL 123525, ¶ 61 (when reviewing a trial court's ruling on a motion to suppress, we may consider evidence from both the suppression hearing and the trial).

¶ 78     As for the task or work the dog was trained to perform, assuming, *arguendo*, that defendant was entitled to know this information, it was adequately conveyed to him by R.L.'s statement at the hearing on August 24, 2019, that getting on her lap was one of the "commands" that it was trained to do when R.L. was anxious. The State reiterated that getting on R.L.'s lap was part of the dog's "work" in assisting her with her disability. At the sentencing hearing, Samuel testified that the dog was trained to detect when R.L. started to "fade out" and that "by using pressure," the dog would "bring her back." Even in *Dilorenzo*, which defendant cites, the court stated, "Had Plaintiff responded by affirming that the dog was her service animal and that it was individually trained to alert her for panic and anxiety attacks, it is not clear on what basis Defendant could object in the future." *Dilorenzo*, 515 F. Supp. 2d at 1194.

¶ 79     Regarding defendant's argument that the trial court did not have to allow the dog because it would fundamentally alter the nature of the service (see 28 C.F.R. § 35.164 (2019)), we note that defendant had a full trial in front of a jury. Defendant has not cited case law or elaborated on how the dog altered the nature of the trial, thereby forfeiting the issue for review. See *People v. Bailey*, 2019 IL App (3d) 180396, ¶ 22 (a reviewing court is not a repository into which an appellant may foist the burden of argument and research, nor is it our role to act as an advocate, and a party's failure to clearly define issues and support them with authority results in forfeiture of the argument). We discuss defendant's confrontation argument later in our opinion.

¶ 80     Turning to defendant's argument that the dog's presence violated his right to a fair trial because it created undue sympathy for R.L., "[a]ll of the courts which have examined a challenge to the use of a comfort dog in a courtroom have concluded that the dog's presence is not inherently prejudicial." *Commonwealth v. Purnell*, 233 A.3d 824, 836 (Pa. Super. Ct. 2020). In particular, the Washington Supreme Court examined this issue in the context of a facility dog in *State v. Dye*, 309 P.3d 1192 (Wash. 2013). The defendant there argued that, among other things, the dog's presence improperly bolstered the main witness's credibility by giving his testimony an " 'aura of truth and sympathy' " and that the dog made the witness look pitiful and like a victim who was telling the truth. *Id.* at 1200. The court stated that none of the defendant's theories had any basis in the record and that defense counsel had conducted

---

[3]Defendant asks for a new trial as an alternative to a finding of not guilty, but he cites no authority for why a finding of error would necessitate the drastic action of an outright acquittal, so we do not consider that remedy. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited ***.").

an extensive cross-examination of the witness. *Id.* It further stated that "whatever subconscious bias may have befallen the jury was cured by the trial court's limiting instruction, which cautioned the jury not to 'make any assumptions or draw any conclusions based on the presence of this service dog.' "[4] *Id.* Similarly, in *People v. Tohom*, 109 A.D.3d 253, 268 (N.Y. App. Div. 2013), the court concluded that a facility dog's accompaniment of the 15-year-old alleged victim "did not adversely affect the defendant's due process right to a fair trial or compromise his constitutional right of confrontation." The court stated that it was not unmindful that the dog "may have engendered some sympathy for [the witness] in the minds of the jurors," but it noted that there was "no proof that such sympathy was significantly greater than the normal human response to a child's testimony about his or her sexual abuse at the hands of an adult." *Id.* The court further noted that the trial court instructed the jury not to allow sympathy to enter into its considerations, especially with respect to an outside factor like the facility dog. *Id.*

¶ 81    A similar analysis applies here, with even greater consideration given to R.L.'s position because she requested the dog's presence under the ADA. The trial court had to balance defendant's right to a fair trial with R.L.'s rights under the ADA and as a minor who was a victim of sexual abuse. Indeed, according to the record, R.L. allegedly suffered from PTSD in the first place because of defendant's actions. *Cf. In re McDonough*, 930 N.E.2d 1279, 1292-93 (Mass. 2010) ("the perpetrator of a crime may inflict such grievous injury on a victim that the victim's ability to testify will be severely constrained" and to exclude the victim's testimony "imposes a particular hardship on the victim"). We also note that the Supreme Court of Illinois Policy on Access for Persons with Disabilities states that the "Court will honor the choice of the individual, unless it demonstrates that another equally effective accommodation is available, or that the requested accommodation would result in a fundamental alteration of Court activities or undue financial and administrative burdens." Supreme Court of Illinois Policy on Access for Persons With Disabilities (eff. Aug. 3, 2012) https://courts.illinois.gov/SupremeCourt/Policies/DisabilityPolicy/disability-policy.pdf [https://perma.cc/U2JP-EF5L]. The trial court had a gate installed on the witness box to obstruct the jury's view of the dog and held a separate hearing with the dog present so that the parties could view how the dog would be seated next to R.L. during the trial. R.L. and the State disclosed that the dog would probably get on her lap while she testified because it was one of the dog's "commands" when R.L. was anxious, and the trial court stated that R.L. should minimize that as much as possible. The trial court further stated that R.L. would be seated with the dog before the jury was brought in and that, after her testimony, the jury would leave the courtroom before R.L. and the dog got up. Before R.L. testified, the trial court instructed the jury in detail regarding the dog, stating:

> "Ladies and Gentlemen of the Jury, I want to instruct you at this time that the witness has a service dog with her while she testifies.
>
> You are not to draw any inference in favor or against either side because of the dog's presence. And the focus of your attention should be on the testimony of the witness.
>
> The presence of the service dog in the courtroom shall not be considered in any way in the jury's deliberations or verdicts."

---

[4]Though the jury instruction referred to the dog as a "service dog," it was actually allowed as a facility dog and was not the witness's personal dog.

A jury is presumed to follow a trial court's jury instructions. *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 61. Based on these considerations, we believe that the trial court adequately compensated for any potential sympathy for R.L. from the dog's presence, such that defendant's right to a fair trial was not violated. See also *Purnell*, 233 A.3d at 837 (the defendant's argument ignored "the fact that some people are afraid of or dislike animals, especially dogs"); *Jones*, 841 S.E.2d at 122 n.8 (same). Accordingly, we hold that the trial court did not abuse its discretion in allowing R.L. to testify with her service dog.

¶ 82    Last, we conclude that defendant's assertion of the violation of his right to confront R.L. is not persuasive. The sixth amendment gives criminal defendants the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. The Illinois Constitution contains the same language. Ill. Const. 1970, art. I, § 8 (amended Nov. 8, 1994). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

¶ 83    In both of the cases that defendant relies on, the defendants' views of the witnesses were physically blocked. See *Coy*, 487 U.S. at 1020-21; *Lofton*, 194 Ill. 2d at 61. *Coy* stated that the confrontation clause "guarantees the defendant a face-to-face meeting with witnesses," which was violated by the screens placed in front of the witnesses (*Coy*, 487 U.S. at 1016, 1020), and *Lofton* stated that the podiums at issue "limited the defendant's ability to aid in the cross-examination of the witness and thereby impinged upon the truth-seeking purpose of the confrontation clause" (*Lofton*, 194 Ill. 2d at 61). Here, in contrast, R.L. testified in clear view of defendant and was subject to an extensive cross-examination by defense counsel. The record reflects that, during cross-examination, the dog got on R.L.'s lap once, blocking her face, but as soon as defense counsel asked that the dog be placed on the ground, the trial court told R.L. to do so and she immediately complied. Defense counsel was then able to resume his cross-examination. Accordingly, defendant's confrontation rights were not violated.

¶ 84                                    B. Testimony About Suicidal Thoughts

¶ 85    Defendant next argues that the trial court abused its discretion in allowing testimony about R.L.'s suicidal thoughts. Defendant points out that the trial court initially sustained objections about R.L.'s testimony about suicide during her direct examination, but then it allowed her to testify over objection that she thought that she would be dead before the abuse was revealed. Defendant argues that the trial court compounded this error by allowing Doherty to testify over objection that R.L. had been making suicidal comments online. Defendant highlights that, in closing argument and rebuttal closing argument, the State repeated R.L.'s testimony about dying before the abuse was discovered. Defendant argues that there was no probative value to the testimony, citing *People v. Hansen*, 352 Ill. App. 3d 40, 53-54 (2004) (admission of death certificate showing suicide would have been very prejudicial to the defendant), and *People v. Fuelner*, 104 Ill. App. 3d 340, 352 (1982) (testimony of victim's suicide attempt and hospitalization was irrelevant and prejudiced the jury against the defendant).

¶ 86    In arguing that there was no probative value to the testimony, defendant asserts that it was not necessary to show why the police got involved in the case, as R.L. had already testified that she told online friends that her uncle had abused her. See *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 110-11 (hearsay statements revealing past accusations of misconduct were inadmissible to explain the course of investigation). Defendant argues that the error was not

harmless because the case was based on credibility and the State used the prejudicial nature of suicide to bolster R.L.'s uncorroborated testimony.

¶ 87 The State argues that R.L.'s testimony that she thought that she would be dead before the abuse was revealed was, at most, ambiguous because it could mean that R.L. believed that she would live out her life without the abuse being discovered; the State points out that there was no reference to suicide or killing herself in that statement. The State argues that this is also true of the mentions of this statement during closing arguments. The State further argues that Doherty was allowed to explain the reasons that the police investigation began. See *People v. Byrd*, 43 Ill. App. 3d 735, 742 (1976) ("Informing the triers of fact of consequential steps in the investigation of a crime is normal procedure and is important to the full presentation of the State's case."). The State additionally argues that, because defense counsel asked Doherty in cross-examination about his understanding that R.L. was "threatening suicide" and repeatedly raised the subject of the online forum, defendant cannot now complain on appeal of an alleged error that he caused or invited. *People v. Harvey*, 211 Ill. 2d 368, 386 (2004).

¶ 88 It is within the trial court's discretion to determine the relevance and admissibility of evidence, and we will not reverse its evidentiary rulings absent an abuse of discretion. *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 49. We agree with the State that the trial court did not abuse its discretion in overruling defendant's objection to R.L.'s testimony that she "thought [she'd] be dead before [the abuse] came out" because it can logically be interpreted to mean that R.L. thought that the abuse would never come to light during her natural lifetime. Moreover, as noted, even if R.L.'s testimony should be otherwise interpreted, defendant cannot complain about references to suicide when defendant's own counsel cross-examined Doherty on that subject. We further agree with the State that the trial court acted within its discretion in overruling defendant's objection to Doherty's testimony. "[A] police officer may testify regarding the steps taken in an investigation of a crime when such testimony is necessary to fully explain the State's case, though such testimony shall not include the substance of any conversation with a person who is not testifying." *People v. Short*, 2020 IL App (1st) 162168, ¶ 69. Here, Doherty's testimony, that the police responded to a report that R.L. had been making suicidal comments online, explains how the police became involved in the case. It also provided context for why the police showed up at R.L.'s house soon after and in turn why R.L. was surprised and not ready to name the abuser right away. In other words, a suicide threat would be more time-sensitive than a disclosure of past abuse. This case is readily distinguishable from *Boling*, 2014 IL App (4th) 120634, ¶ 110, as that case involved hearsay statements that suggested that the defendant had committed similar crimes in the past. We therefore conclude that the trial court acted within its discretion in allowing the disputed testimony.

¶ 89                                    III. CONCLUSION

¶ 90 For the reasons stated, we affirm the judgment of the McHenry County circuit court.

¶ 91 Affirmed.

- 20 -